**DALLAS CERAMIC COMPANY, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 77–1301.**

United States Court of Appeals, Fifth Circuit.

July 23, 1979.

Ethan B. Stroud, Cameron Dee Sewell, David A. Ives, Dallas, Tex., for plaintiff-appellant.

Kenneth J. Mighell, U. S. Atty, Fort Worth, Tex., Martha Joe Stroud, Asst. U. S. Atty., Dallas, Tex., Gilbert E. Andrews, Act. Chief Appellate Sec., U. S. Dept. of Justice, Washington, D. C., M. Carr Ferguson, Asst. Atty. Gen., Jonathan S. Cohen, George G. Wolf, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WISDOM, COLEMAN and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This appeal is from a judgment by the district court denying Dallas Ceramic Company a refund of taxes, penalties and interest for the year 1966 with respect to a reallocation of income between Dallas Ceramic Company and Ceramica Regiomontana, Inc. made by the Tax Commissioner pursuant to § 482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 482. The reallocation came as an adjustment in cost of goods sold resulting from the Commissioner's change in the price Dallas Ceramic paid for tile purchased from Ceramica.

The Commissioner had determined a deficiency in the federal income tax of Dallas

Ceramic for the taxable year 1966. Dallas Ceramic paid the deficiency and penalty for that year, plus interest, and brought this suit for refund in the district court. Dallas Ceramic and other individuals petitioned the Tax Court for relief from similar allocations made by the Commissioner for tax years 1963, 1964 and 1965 and litigated essentially the same issues before the Tax Court. Following trial and a supplementary evidentiary hearing in the district court, but before the district court entered a supplemental opinion, order and final judgment, the Tax Court reached its decision in *Brittingham v. Commissioner*, 66 T.C. 373 (1976), in favor of the taxpayers, from which the Government appealed to this Court in a separate proceeding. This Court has this day affirmed the decision of the Tax Court. *Brittingham v. Commissioner*, 598 F.2d 1376 (5th Cir. 1979).

There seems little question but that the Tax Court case and the district court case should come out the same. Although the evidence before each court differed, to some extent because of evidentiary rulings made by the two courts, and the theories pursued by both the taxpayer and the Government may have differed somewhat in the two courts, no one contends that the facts themselves differed from one year to the next. The distinction factually between the two courts results from differing evaluation of the significance of the evidence and subtle differences in the application of the law. The law for both cases, however, has to be the same when they both reach this Court at the same time. Having now affirmed the decision of the Tax Court, and the law there applied, we have established the law of this Circuit to be applied in this case.

On this appeal, we agree with the taxpayer that the essential difference between the decision of the district court and the Tax Court came with the handling of certain representations made to the Customs officials as to the market price of tile several years prior to the tax years here in question. Although not articulated as such, it

seems to us that the district court treated this evidence as creating, if not an estoppel, a greater hurdle for the taxpayer than it should have been because of the court's failure to note the difference between the considerations of value for Customs duty and the proper value for cost of goods sold in the income tax law.

We, therefore, reverse the judgment of the district court.

Dallas Ceramic is a Texas corporation organized in 1947 by Juan Brittingham, his brother, Robert Brittingham and their friend, Jack Jenkins. Since that time it has manufactured ceramic wall tile, trademarked Dal-Tile, in Dallas, Texas for resale. Additionally Dallas Ceramic has purchased tile and tile related items for resale through its warehouses and independent distributors. Since its organization, Juan and Robert and their immediate families have always owned an identical interest in Dallas Ceramic. By 1966 Jenkins had sold his interest in Dallas Ceramic, Juan and Robert and their respective immediate families each owned 37% of the stock of the company, and other relatives owned the 26% balance of the stock. Specifically Robert, as the largest individual shareholder, owned 16% of the stock, and Juan owned 1% of the stock. Hereafter, reference to stock "owned" by Robert or Juan includes that owned by their respective immediate families.

From 1963 up to 1966 Robert was president of Dallas Ceramic and controlled its corporate affairs. Up to 1963, when he sold his interest, Jenkins and Robert had alternated, each year, as president of the company. Juan Brittingham was a member of the board of directors of Dallas Ceramic.

Ceramica is a Mexican corporation organized by Juan Brittingham in 1955. Juan and his wife owned 60% of Ceramica in 1966, and his mother, Roberta, owned 40%. As Director General and major shareholder, Juan controlled all of the corporate activities of Ceramica. Robert Brittingham, his immediate family, and the uncles, aunts and

cousins owning the remaining 26% in Dallas Ceramic had no ownership interest in Ceramica. The ownership of the two companies was thus as follows:

| | Juan | Robert | Roberta | Other Relatives |
|---|---|---|---|---|
| Dallas Ceramic | 37% | 37% | 0% | 26% |
| Ceramica Regiomontana | 60% | 0% | 40% | 0% |

Through a power of attorney arrangement, Juan exercised complete control over the 40% interest of Ceramica owned by his mother, Roberta.

Before organizing Ceramica in 1955, Juan Brittingham was part owner and production manager of another Mexican tile manufacturing company, Productos Ceramicos (Productos) which produced tile brand named Procesa. On occasion from 1947 to 1954 Dallas Ceramic purchased Procesa tile from Productos. Robert Brittingham testified that Dallas Ceramic was generally dissatisfied with the Procesa tile because it was not standard grade. A piece of standard grade tile is one that is commercially perfect. A box of standard grade tile is one that contains at least 95% standard grade pieces. These are voluntary grading standards established by the United States Department of Commerce.

After leaving Productos, Juan formed Ceramica. Ceramica manufactured and sold ceramic wall and floor tile with a brand name of Dal-Monte. Although some of this tile was sold in Mexico, the principal purchaser was Dallas Ceramic, which was Ceramica's exclusive distributor in the United States. During tax year 1966, Dallas Ceramic purchased approximately 59% of Ceramica's production. These purchases of Ceramica's tile represented, however, about one-third of Dallas Ceramic's sales.

Dallas Ceramic began purchasing tile from Ceramica in 1955. As a condition precedent to its purchase of tile, Dallas Ceramic required Ceramica to provide Dallas Ceramic with certain intangible benefits as follows: using 100% American raw materials in its tile; maintaining a month's inventory (approximately $200,000 worth of tile) in its warehouses which Dallas Ceramic could call on at any time; packing its tile to meet and exceed the requirements for U. S. standards which required at least 95 pieces of standard grade tile in each box of 100 pieces; extending 180 days credit for payment; honoring first call on its production; granting exclusive right to Dallas Ceramic to distribute its tile in the United States; color coordinating its tile with that of Dallas Ceramic; providing all of the types of trim pieces necessary for sales in the United States; packing the tile in boxes of a higher quality than that used by other Mexican companies; and etching in each tile the Dal-Monte trademark. Ceramica agreed to provide all of these intangible benefits and did so from 1956 through the tax year 1966.

### Customs Evidence

In response to changes in the customs laws, Dallas Ceramic applied to Customs in 1958 for a determination of the dutiable value of the Dal-Monte imported tile. The Customs Simplification Act of 1956, 19 U.S.C.A. § 1401a(a). Prior to 1958, because Ceramica sold its tile exclusively to Dallas Ceramic in the United States, the invoice price of those sales were not acceptable to Customs for "dutiable value" purposes because such tile was not "freely offered" to anyone who wanted to purchase it. 19 U.S.C.A. § 1401a(b), (f). Dallas Ceramic's customs lawyer represented that the intangibles associated with Dal-Monte tile were not dutiable because they were not offered by other manufacturers in the ordinary course of trade and the Dal-Monte fair market value and invoice price would be higher than the price of similar merchandise without such intangibles. The dutiable value, however, would be the same.

Under the old laws, Customs used either "foreign value" of the Dal-Monte tile (the price at which Ceramica was selling in Mexico) or "export value" (the price at which other companies were selling tile to the United States) of similar tile freely offered for sale in the United States.

In connection with its 1958 application to Customs for a redetermination of dutiable value, Dallas Ceramic represented in several communications to Customs that Dallas Ceramic and Ceramica operated under a common control and did not engage in any arm's length bargaining with each other in connection with their sale and purchase of tile. Juan and Robert Brittingham contended that the Dal-Monte tile purchased from Ceramica should continue to be appraised by Customs on the basis of similar merchandise freely offered for sale in the United States and that the "export value" of Dal-Monte tile should not be determined by reference to its invoice price, but should be determined by reference to the lower price at which Procesa tile (comparable tile produced in Mexico by Productos and sold in the United States) was sold. Accordingly, a letter dated March 10, 1958, signed by Robert and Juan Brittingham was submitted to Customs. Representations in the letter included:

> Due to the control of the Brittingham families and relatives of the two companies, the law of supply and demand has no bearing on the price paid for the tile nor is there any opportunity of bargaining between seller and receiver, and the invoice price arrived at cannot be said to fairly reflect the market value of the merchandise.

Similar representations were made by Dallas Ceramic's lawyer in her memorandum to Customs supporting the application for an "export value" below invoice price:

> Ceramica . . . sells its tile for export to the United States [i. e. to Dallas Ceramic] at a price structure which is substantially *higher* than and does not reflect the true market value of its tile; and this is only due to the fact that the parties in interest in the respective companies are relatives. (Emphasis in original).

Dallas Ceramic urged that the tile should be determined by the price at which Procesa tile was freely sold in the United States,

as "similar merchandise" under the Tariff Act, Section 402(b), 19 U.S.C.A. § 1401a(b). In support of this argument, Dallas Ceramic's March 1958 letter to Customs stated:

> It is our opinion that tile shipped by Ceramica . . . to Dallas Ceramic is similar to tile manufactured and shipped to the States by Productos . . . at Monterrey . . . . Mr. Jack [Juan] Brittington was part owner of the tile factory, Productos . . ., until about three years ago when he sold his interest and organized and started operating the tile plant Ceramica. . . . He is thoroughly familiar with the procedure and material used in making tile. According to information furnished by Mr. Jack Brittingham, . . . [t]he tile is made of the same size and to U.S. Grade Specifications with identical lugs, and if of same color and shade, it would be commercially interchangeable and adaptable to the same use. The cost of labor in both plants is approximately the same, which means that the cost of manufacturing per square ft. of tile is approximately the same.

> It is our opinion that the above information clearly indicates that the tile shipped by Ceramica . . . is similar in all respects to the tile exported to the United States by Productos . . ., and in the absence of export value on tile shipped to the States by Ceramica . . . the export price of similar tile exported to the States by Productos . . . is proper for appraisement purposes.

In addition the lawyer for Dallas Ceramic argued to Customs that Procesa tile was "similar" to Ceramica's tile under either of the following definitions of that term in Section 402(f)(4) of the Tariff Act, 19 U.S.C.A. § 1401a(f)(4)(B), (C) and (D):

> (B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

> (C) [and (D)] Merchandise (i) produced in the same country and . . . [by

another person] as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

The Bureau of Customs, based on the representations made in 1958, decided that the dutiable value of Ceramica's tile should be appraised at the price at which corresponding Procesa tile was imported into and freely offered to independent purchasers in the United States, and not the invoice price. This method of appraisal saved Dallas Ceramic $105,560.93 in Customs duties in 1966.

It should also be noted that Robert Brittingham, in a letter dated May 10, 1973 to Customs, stated:

There have been no changes, over the intervening years, in the material facts asserted in 1958 in our application to the Bureau of Customs for a ruling on the dutiable value of tile manufactured in Mexico by Ceramica Regiomontana and imported into the United States by Dallas Ceramic Company.

\* \* \* \* \* \*

[I]n the terminology of the customs laws . . . ., our transactions do not constitute "arm's-length transactions" "in the ordinary course of trade" to a selected purchaser at wholesale "at a price which fairly reflects the market value" of tile manufactured in Mexico and sold and freely offered for sale for export to the United States.

The communications to Customs pointed out, in addition, that definitions of common control and arm's length price under Customs laws were significantly different from the meaning of those terms under internal revenue laws.

### Exclusion of Customs Evidence Sought to be Presented by Dallas Ceramic

In its pretrial order, the district court sustained Dallas Ceramic's Motion In Li-

mine to exclude certain evidence of these Customs communications. During the trial, the Government made its offer of proof with respect to the Customs evidence which had been excluded pursuant to Dallas Ceramic's motion. Dallas Ceramic relying upon the district court's ruling in its pretrial order, neither cross-examined the Government's witnesses on its offer of proof nor called Dallas Ceramic's witnesses to introduce rebuttal evidence with respect to the Customs evidence included in the Government's offer of proof.

Twenty-eight days after trial and after the close of all evidence, the district court changed its ruling and admitted the evidence of taxpayer's representations to Customs regarding the similarity of Dal-Monte and Procesa tile presented by the Government in its offer of proof. The court concluded that Dallas Ceramic's Motion for A New Trial because of newly discovered evidence should be denied, but also held that "the trial of this case should be reopened so that the parties may offer additional evidence relating to such dealings [with Customs] and in particular the two letters in question."

Pursuant to the district court's order, the trial was reopened in March 1976. At the partial new trial, however, Dallas Ceramic was limited with respect to the evidence that it was allowed to introduce. The district court prohibited Dallas Ceramic from introducing a substantial portion of its rebuttal evidence concerning the changes in quality from 1958 to 1966 in the Procesa tile referred to in the two Customs letters.

The representations made by the Brittinghams to Customs regarding the similarity of Dal-Monte tile and Procesa tile were essential to the district court's determination of the market price of Dal-Monte tile and the corresponding 1966 tax liability of Dallas Ceramic. Indeed the district court said,

1. The starting point for any comparison of the two products must be the 1958 letter from Juan and Robert Brittingham

to the Bureau of Customs. They stated: "It is our opinion that tile shipped by Ceramica [Dal-Monte tile] . . . to Dallas Ceramic is similar to tile shipped to the United States by Productos [Procesa tile].

\*   \*   \*   \*   \*   \*

Again on May 10, 1973, Juan and Robert by letter assured the Bureau of Customs that in the intervening period from 1958 all had remained the same.

The Government concedes the district court refused to permit Dallas Ceramic to introduce evidence at the supplemental trial as to whether Ceramica's tile (Dal-Monte) and Productos' tile (Procesa) were in fact similar in 1966, contending that such evidence should have been presented at the initial trial in 1974. Arguing that evidence of the quality of Procesa tile in 1966 became relevant only after the district court permitted the Government to introduce the 1958 and 1973 representations made to Customs, Dallas Ceramic contends that all of its evidence regarding the change in value of Procesa tile between years 1958 and 1966 excluded by the district court is proper rebuttal evidence.

Additionally, between the entry of the district court's November 1975 order and the March 1976 trial, Dallas Ceramic attempted to take the depositions of various Government employees whose testimony related to investigations of Dallas Ceramic by Customs agents and their findings regarding the similarity of Dal-Monte tile and Procesa tile. The district court quashed Dallas Ceramic's subpoenas and overruled Dallas Ceramic's Motion to Compel Answers of these witnesses. Dallas Ceramic contends it suffered substantial prejudice as a result of these evidentiary rulings because it was not permitted to rebut adequately the Customs evidence relied on by the district court in its decision. In contrast to the district court's handling of the Customs evidence, the Tax Court admitted it all, from the very beginning, giving the taxpayers full range in showing how the Customs evidence was unreliable for the purpose of establishing market price in this case.

### Use of Customs Evidence

In reaching the conclusion that Dallas Ceramic and Ceramica were controlled by the same interests, the district court determined that Dallas Ceramic did not pay an arm's length price for the Dal-Monte tile produced by Ceramica. Whether Dallas Ceramic paid an arm's length price for tile purchased from Ceramica assists in determining whether the two companies were controlled by the "same interests" and shifted income between them in order to avoid payment of taxes.

Treasury Regulation § 1.482–2(e)(1)(i) (1968) provides that "an arm's length price [for tangible property such as tile] is the price that an unrelated party would have paid under the same circumstances for the property involved in the controlled sale."

Central to the district court's conclusion on arm's length pricing was its reliance on the March 1958 letter from Robert and Juan Brittingham to Customs. The district court found that the 1958 communications to Customs asserting the similarity of Dal-Monte tile and Procesa tile (produced by a competing Mexican company) and the common control of the Dallas Ceramic and Ceramica constituted an admission of facts inconsistent with taxpayer's position regarding tile sold in 1966. In addition the district court found unconvincing the fact that Ceramica made more trim pieces available as an explanation for the difference in price of Dal-Monte and Procesa tile: Procesa— 22¢ and 27.5¢/sq. ft.; Dal-Monte 28.8¢ and 31.5¢/sq. ft. Procesa tile was produced by Productos Company, a Mexican corporation which sold tile in the United States. Because Procesa tile was distributed in approximately the same geographical area in the United States as Dal-Monte tile, the tile sold by Ceramica to Dallas Ceramic, they were compared by the district court to determine the appropriate arm's length price.

The court found the testimony of the Government's witness Brian DeGraffenried credible and accepted his statements that Procesa tile was comparable to Dal-Monte tile, but the Procesa line of tile was simple and unadorned. DeGraffenried testified Procesa was sold as a second line, having "minimum scale of quality." On cross-examination DeGraffenried testified that Procesa did not advertise, did not make trim shapes, did not manufacture a complete package of tile necessary for someone to make a total selection for a building, did not make floor tile, and Procesa's tile did not equal the line of tile produced by other companies such as Dallas Ceramic. Summing up his testimony, DeGraffenried testified that Procesa tile was like a basic Ford car instead of the luxury model LTD Brougham and that Procesa tile would probably not be considered by an American architect or decorator since the tile did not come in a complete package which would permit a selection from its line for a total building. Further, the Procesa tile was a very simple line which in no way compared with the tile Dallas Ceramic marketed to American buyers. The district court apparently disregarded this testimony DeGraffenried gave on cross-examination. The district court found not credible the testimony of Mr. Lascurian, sales manager of Productos, who testified that the Procesa tile sold in the United States was second and third class, far inferior to Dal-Monte.

Under the tax regulations factors such as quality, quantity, availability, reputation and sales terms are to be taken into account when determining whether there is an arm's length price. Treas.Reg. § 1.482–2(e)(2)(ii) (1968). The Commissioner's determination was unreasonable insofar as it relied on a formula which incorporated an erroneous assumption of likeness between Procesa tile and Dal-Monte tile in 1966 for determining the arm's length price of Dal-Monte tile and failed to take into proper account differences in factors included in Regulation 1.482–2(e)(2)(ii).

■ It appears that the evidence excluded by the district court at the supplemental hearing and as a result of the denial of taxpayer's motion for a new trial related to Customs rebuttal evidence and factors Dallas Ceramic contends should be taken into account when comparing Procesa and Dal-Monte tile for purposes of determining an arm's length price.

The manner in which the Tax Court handled this Customs evidence is shown by its opinion attached to the companion case of *Brittingham v. Commissioner,* 598 F.2d 1376 (5th Cir. 1979). As a matter of law, we agree with the Tax Court as to the difference between Customs law and tax law in determining the value to be given to the tile.

The district court did state "The court is expressly relying on the government's showing that the price paid by Dallas Ceramic was unreasonable, not upon the failure of Dallas Ceramic to prove the Commissioner's apportionment was unreasonable." A review of the record, however, convinces us that the district court's heavy reliance on the Customs evidence without giving the taxpayer a full opportunity to present rebuttal evidence before the conclusion was reached, and without noting the difference between Customs price and arm's length price for tax purposes, requires a reversal of this finding.

### Shifting of Income Approach to Common Control

■ In its final decision, the district court reasoned from its perceived shifting of income due to the more-than-arm's-length-price of tile to conclude that there was common control of the two corporations. The Government accurately argues that proof of a shifting of income between two corporations establishes a presumption of common control. Treas.Reg. § 1.482–1(a)(3) (1968). But when the Government seeks to show the applicability of § 482 by this method, it has the burden of proving the shifting of income. Aside from the price of tile, discussed earlier in this opinion, however, there was insufficient evi-

dence to show that wealth shifted from Robert's pockets to Juan's pockets and from Juan's pockets back to Robert's other pocket. There was testimony by Robert Brittingham that he had never received any kickbacks, rebates or any form of payments from Juan or Ceramica. Indeed the Tax Court said:

> To believe that Robert would be a part of a plan to divert $1.5 million from a corporation in which he and his children owned a 37%-percent interest to a corporation in which his immediate family had no interest strains all credulity.

There was no evidence in the instant case of a plan to shift income. The district court specifically rejected the Tax Court's conclusion that the Government had the burden of showing how Robert Brittingham benefited from the alleged income shifting scheme. In our view, the burden is on the Government to prove the shifting of income if that fact is to create a presumption of common control. *Cf. Carson v. United States,* 560 F.2d 693, 697 (5th Cir. 1977).

Review of the cases relied on by the district court shows the difference in circumstances which permitted allocation under § 482 in the cases it cited. Such circumstances are not present here. It was determined that income was shifted from Charles Town Corporation to Fairmount Corporation in *Charles Town, Inc. v. Commissioner,* 372 F.2d 415 (4th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 69, 19 L.Ed.2d 104 (1967), where two brothers equally owned and controlled Fairmount Corporation for the purpose of leasing a race track and sponsoring horse racing meets. The two brothers controlled Charles Town through an intercorporate written agreement although they owned very little of the company. The written agreement and other arrangements clearly evidenced control by the same interests. Further, *Hall v. Commissioner,* 294 F.2d 82 (5th Cir. 1961); *Grenada Industries, Inc. v. Commissioner,* 17 T.C. 231, *aff'd,* 202 F.2d 873 (5th Cir.), *cert. denied,* 346 U.S. 819, 74 S.Ct. 32, 98

L.Ed. 345 (1953); *Ach v. Commissioner,* 358 F.2d 342 (6th Cir.), *cert. denied,* 385 U.S. 899, 87 S.Ct. 205, 17 L.Ed.2d 131 (1966); and *Advance Machinery Exchange, Inc. v. Commissioner,* 196 F.2d 1006 (2d Cir.), *cert. denied,* 344 U.S. 835, 73 S.Ct. 45, 97 L.Ed. 650 (1952), were cases in which the fact that different persons were related was not the sole basis for determining that the interests involved were the same. In each case, the same people either owned or controlled an interest in each of the controlled businesses. Here, Robert Brittingham had no interest in Ceramica and there is no evidence showing that Robert exercised any control over the corporate affairs of Ceramica. The other cases relied on by the district court involved income shifting between parent companies and their subsidiaries. *Lufkin Foundry & Machine Co. v. Commissioner,* 468 F.2d 805 (5th Cir. 1972); *Oil Base, Inc. v. Commissioner,* 362 F.2d 212, 214 (9th Cir.), *cert. denied,* 385 U.S. 928, 87 S.Ct. 287, 17 L.Ed.2d 211 (1966); *Eli Lilly & Co. v. United States,* 372 F.2d 990, 178 Ct.Cl. 666 (1967); *Your Host, Inc. v. Commissioner,* 489 F.2d 957 (2d Cir. 1973), *cert. denied,* 419 U.S. 829, 95 S.Ct. 51, 42 L.Ed.2d 54 (1974); and *Central Cuba Sugar Co. v. Commissioner,* 198 F.2d 214 (2d Cir.), *cert. denied,* 344 U.S. 874, 73 S.Ct. 167, 97 L.Ed. 677 (1952). In the instant case there is no parent-subsidiary relationship between the two corporations. Nor was a reason for Robert Brittingham to shift income to Ceramica demonstrated in the record.

The Government accurately argues that its allocation under § 482 is presumptively correct, and it is insufficient for the taxpayer to merely show that its determination of an arm's length price is wrong. *Engineering Sales, Inc. v. United States,* 510 F.2d 565 (5th Cir. 1975). In order to arrive at that position, however, the Government must show that there was common control of the corporations so that § 482 applies.

Since we cannot sustain on this record the district court's decision that there was income shifting, which creates a presump-

tion of control, we look to the question of whether common control was otherwise established so that the presumptive correctness of the allocation comes into effect.

### Control by the Same Interests

The term "control by the same interests" is neither defined in the Tax Code, nor in the regulations. To determine whether Dallas Ceramic and Ceramica were "controlled" companies the district court relied on a number of court decisions involving control of businesses within the meaning of § 482 by persons related by blood and marriage. *E. g., South Texas Rice Warehouse v. Commissioner,* 366 F.2d 890 (5th Cir. 1966), *cert. denied,* 386 U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 454 (1967) and *Engineering Sales, Inc. v. United States, supra. South Texas Rice Warehouse, supra,* involved a situation in which substantially the same family members who owned 65% of the warehouse corporation stock also owned *all* of the partnership which leased operating assets from the warehouse. Each family group in *South Texas Rice Warehouse* owned an interest in each business involved, and the variation of ownership in each family group was a result of a plan by three fathers to shift income to their children. In the instant case Robert Brittingham and his family did not own proportionate interests in both corporations. In fact, no person who owned an interest in Dallas Ceramic owned an interest in Ceramica except Juan Brittingham, principal owner of Ceramica, and his immediate family, owned 37% of Dallas Ceramic. In *Engineering Sales, Inc., supra* at 567, the taxpayers conceded that the two companies at issue were owned or controlled by the same interests within the meaning of § 482. There, taxpayers challenged the Commissioner's determination that dividends paid by Engineered Products, a marketing corporation, to children whose parents owned all the stock in Engineering Sales, a manufacturing corporation, should be constructed to the parents. In

sharp contrast no concession to § 482 control has been made by Dallas Ceramic.

The Government does not seriously argue on this appeal that even the district court would have held that the above facts would show common control of the two corporations within § 482 were it not for the intercorporate pricing of tile. The record in the district court does not, on the basis of lack of arm's length pricing or wealth shifting, support the finding of common control necessary to trigger the Commissioner's authority to make presumptively correct its allocation of income and deductions between the two corporations.

Were it not for the authority of our decision in *Brittingham,* the proper course would be to remand the case to the district court in order to give the taxpayer the full opportunity that was denied it to litigate the question of whether or not there was income shifting through the more-than-arm's-length tile pricing. With *Brittingham* having been decided, however, we reverse and render for four reasons. First, there is no reason to suppose that the district court, with the same evidence before it as was before the Tax Court, would not reach the same conclusion in applying the same law as has been determined by these two opinions. Second, the Government does not argue that the actual facts in 1966 were any different than in the years 1963, 1964 and 1965. Third, since like taxpayers in like situations should be treated the same, so should the same taxpayer in like situations. Fourth, although res judicata and collateral estoppel do not exactly apply in this situation, our sense of judicial consistency dictates that these two cases should come out the same, and it would be against common sense to prolong this litigation further.

The decision of the district court is reversed and the case is remanded for entry of a judgment consistent with this opinion.

REVERSED AND REMANDED.