SUNSHINE DEPARTMENT STORES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sunshine Dep't Stores v. Commissioner
Docket No. 1161-78.
United States Tax Court
T.C. Memo 1981-586; 1981 Tax Ct. Memo LEXIS 159; 42 T.C.M. (CCH) 1379; T.C.M. (RIA) 81586; October 7, 1981. *159 Petitioner was one of a group of related entities, including three corporations, a partnership and an estate. The estate controlled the voting stock of petitioner and another of the corporations and a substantial bloc of stock of the third corporation. A majority of the estate's fiduciaries were also its principal beneficiaries and owned or controlled substantial interests in the other entities. Over the course of a number of years, petitioner made substantial interest-free loans to each of the other entities. The respondent allocated interest income on the loans to petitioner under sec. 482, I.R.C. 1954 and section 1.482-2, Income Tax Regs.Held: (1) the activities participated in by the estate through the entities in which it held a controlling or substantial interest constitute a "business" for purposes of section 482. Asiatic Petroleum Co. v. Commissioner, 79 F.2d 234 (2d Cir. 1935), applied; (2) the facts of this case establish that the entities under consideration were organizations, trades, or businesses owned or controlled directly or indirectly by the same interests for purposes of sec. 482; (3) the allocation of interest income to petitioner on the interest-free loans *160 to the various entities was necessary to prevent the evasion of taxes and clearly to reflect the income of petitioner, and was not an abuse of discretion by the Commissioner; and (4) advances to Musicville, a corporation as to which petitioner held itself out as being a 50 percent owner, were contributions to the capital of Musicville and not loans. Losses arising therefrom are therefore subject to the capital loss limitation of section 1211, I.R.C. 1954. Joe W. Gerstein, for the petitioner. David D. Aughtry, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioner's federal income tax for the taxable years ending January 31, 1974, and January 31, 1975, in the respective amounts of $ 19,291.38 and $ 4,401.11. The issues for decision are: (1) whether respondent abused the discretion granted to him under section 482[1] by imputing interest income to petitioner on the basis of various interest-free loans which petitioner made; and (2) whether advances made to Musicville, U.S.A., Inc. by petitioner constituted loans or capital contributions and if loans, the treatment to be afforded them when they became uncollectible. *161 FINDINGS OF FACT At the time the petition was filed in this case, petitioner was a corporation with its office and principal place of business in Atlanta, Georgia. The petitioner, Sunshine Department Stores, Inc. ("petitioner") is a Georgia corporation formed on March 3, 1959, which owns and operates a chain of discount stores in the Atlanta, Georgia, vicinity. Sunshine Holding Company, Inc. ("Holding") is a Georgia corporation formed on October 14, 1959, which owns and leases a shopping center located on Moreland Avenue, Atlanta, Georgia. Sunshine Plaza Annex, Inc. ("Plaza") is a Georgia corporation formed on September 13, 1963, which owns and leases property adjacent to the shopping center owned by Holding. Buford-Clairmont, Inc. was a Georgia corporation formed April 27, 1967, which owned and operated a shopping center at the intersection of Buford Highway and Clairmont Road in Atlanta, Georgia. On December 31, 1973, Buford-Clairmont, Inc. was converted into a partnership known as Buford-Clairmont Company ("Clairmont"). *162 Petitioner operates discount stores on the property owned by Holding and Clairmont. Harry Sunshine, now deceased, initially operated petitioner. At all times relevant hereto, petitioner was owned by the following parties in the following proportions: Stock A
Stock B
Stockholder
Relation
(voting)
(non-voting)
Estate of H. Sunshine
Father's Est.
100 sh.
5300 sh.
Lillie S. Sunshine
Mother
586 sh.
Philip Sunshine
Son
654 sh.
Florence S. Bernes
Daughter
654 sh.
Shirley S. Levin
Daughter
654 sh.
Alan G. Sunshine
Grandson
326 sh.
Stanley Sunshine
Grandson
326 sh.
At all times relevant hereto, Holding was owned by the following parties in the following proportions: Stockholder
Relation
Stock
Estate of H. Sunshine
Father's Est.
243 sh.
Lillie S. Sunshine
Mother
75 sh.
Philip Sunshine
Son
150 sh.
Ann Kaplan
Daughter-in-law
75 sh.
Sunshine Dept. Stores
130 sh. At all times relevant hereto, Plaza was owned by the following parties in the following proportions: Stock A
Stock B
Stockholder
Relation
(non-voting)
(voting)
Estate of H. Sunshine Father's Est.
100 sh.
Lillie S. Sunshine
Mother
7 sh.
Philip Sunshine
Son
15 sh.
Philip Sunshine as
Custodian for Minor
Children
Grandchildren
12 sh.
Florence Bernes
Daughter
15 sh.
Florence Bernes as
Custodian for Minor
Children
Grandchildren
12 sh.
Ann Kaplan
Daughter-in-law
7 sh.
(former wife of
deceased son,
Irving Sunshine)
Ann Kaplan as
Custodian for Minor
Children
Grandchildren
14 sh.
Shirley Levin
Daughter
10 sh.
Shirley Levin as
Custodian for Minor
Children
Grandchildren
8 sh.
At *163 all times relevant hereto, Clairmont was owned by the following parties in the following proportions: Partner
Relation
Percent Owned
Lillie Sunshine
Mother
50
Philip Sunshine
Son
20
Shirley S. Levin
Daughter
10
Florence S. Bernes
Daughter
10
Alan G. Sunshine
Grandson
5
Philip Sunshine as
testamentary custodian
for Stanley Sunshine
Grandson
5
Harry Sunshine died testate on April 18, 1967. The will as republished by codicil provides that, following the later of the death of the testator's wife and son or the youngest grandchild reaching the age of 23 years, the testator's stock in petitioner would be distributed as follows: Stock
Beneficiary
Relation
Voting
Non-voting
Philip Sunshine
Son
51%
40%
Alan Sunshine, with
Grandson
9-1/2%
10%
Philip Sunshine
serving as custodian
until Alan reaches 21
Stanley Sunshine,
Grandson
9-1/2%
10%
with Philip Sunshine
serving as custodian
until Stanley reaches
21
Shirley S. Levin
Daughter
15%
20%
Florence S. Bernes
Daughter
15%
20%
The conditions precedent to distribution did not occur prior to or during the years before the Court and during each year the stock continued to be held by the fiduciaries named in the will. The codicial further provides that all voting stock in Plaza is to be bequeathed to the *164 testator's wife if living at the time of testator's death. Testator's wife, Lillie S. Sunshine, survived her husband and was living at all times relevant to the matters sub judice. Subject to the condition of survival, testator's wife was also to take one-half of the residue of testator's estate. The remainder of the residue was to pass in the same manner as provided for the non-voting stock in petitioner. Philip Sunshine directed the day-to-day affairs of petitioner, Holding, Plaza, Clairmont and the Estate at all times relevant hereto. The books and records of all of these entities were kept at 4100 Shirley Drive, Atlanta, Georgia, during the years in issue. At all times relevant hereto, Philip Sunshine and his mother, Lillie S. Sunshine, were Secretary and President, respectively, of petitioner, Plaza and Holding. Philip Sunshine was, during the years in question, a director of petitioner, Plaza and Holding and a managing partner of Clairmont. Philip Sunshine is also one of the primary beneficiaries and an executor of the Estate and a trustee under the will. Over the course of a number of years, petitioner made non-interest bearing cash advances to Holding, Plaza, Clairmont *165 and the Estate. The average annual balances of the loans to these four entities during the years in issue were as follows: Entity
EYE 1/31/74
FYE 1/31/75
Plaza
$ 54,034.20
$ 54,034.20
Holding
23,424.63
23,424.63
Clairmont
126,127.33
170,477.71
Estate of H. Sunshine
100,221.35
100,221.35
TOTAL
$ 303,807.51
[2] $ 348,157.89
These advances were treated as debts both on the books of petitioner and on those of the borrowers: they were carried as an account receivable on petitioner's books and as an account payable on the borrowers' books. The advances were made over a number of years and were not for any entity's start-up expenses. As a matter of practice, the total advances to Clairmont and to the Estate would be repaid to petitioner shortly before the close of a given accounting and tax year. Clairmont and the Estate would obtain loans from Citizens and Southern National Bank of Georgia, the proceeds of which were credited to the account of the petitioner at the same bank.The effect was to reduce the outstanding loans receivable of petitioner at year-end. Immediately after the beginning of the next year, new *166 advances would be made by the petitioner to these entities in amounts substantially equivalent to the old advances. Since the new advances were then used by the respective borrowers to satisfy the loans from the bank, such loans remained outstanding only for the several days necessary to bridge the close of one accounting year and the commencement of the subsequent year. Adjusting entries were made on the books of all entities for the pre-year-end transfers and were reversed by the next year's advances. A schedule of the balance of the loans to the four entities along with the advances and repayments is as follows: [3]
Holding
Plaza
Clairmont
Estate
Balance
$ 23,424.63
$ 54,034.20
$ 102,254.66
$ 100,442.69
2/1/73
Advances
0
4,801.40
92,372.69
1,593.79
$ 23,424.63
$ 58,835.60
$ 194,627.35
$ 102,036.48
Repayments
0
4,801.40
194,627.35
102,036.48
Balance
$ 23,424.63
$ 54,034.20
0
0
1/31/74
Balance
$ 23,424.63
$ 54,034.20
$ 150,000.00
$ 100,000.00
2/1/74
Advances
0
3,000.00
90,223.30
973.59
$ 23,424.63
$ 57,034.20
$ 240,223.30
$ 100,973.59
Repayments
0
3,000.00
240,223.30
100,973.59
Balance
$ 23,424.63
$ 54,034.20
0
0
1/31/75
Balance
$ 23,424.63
$ 54,034.20
$ 190,955.42
$ 100,458.19
2/1/75
*167 Holding, Plaza, Clairmont and the Estate could have acquired arm's-length financing and paid any resulting interest. Except for the above-mentioned "bridge" loans, no attempt was made to acquire outside financing by any of the four borrowing entities during the taxable years in question. The financial statements of Holding, Plaza and Clairmont reflect the following capital account balances: Entity
FYE
Capital Account
Holding
10/31/73
Unknown
10/31/74
$ 81,689.71 10/31/75
$ 101,730.42 Plaza
12/31/73
$ 143,431.08 12/31/74
$ 150,131.97 12/31/75
$ 144,410.75 Clairmont
3/31/73
$ 97,485.33 3/31/74
($ 62,592.82)
3/31/75
($ 158,314.64)
The capital account deficits of Clairmont for the fiscal years ended March 31, 1974, and March 31, 1975, were caused by loans made to its partners. Petitioner was not a partner of Clairmont. The Estate reported the following assets and values as included in the gross estate: Asset
Value at date of death
Real estate
$ 399,600.00
Stocks and bonds
188,644.64
Mortgages, notes & cash
8,395.32
Insurance
20,468.11
Total
$ 617,108.07
All of the borrowers reported negative or zero taxable income during the periods in question, with the exception of Holding for its taxable year ended October 31, *168 1975. In his statutory notice of deficiency, the respondent determined that, under the authority of section 482, interest income should be allocated to the petitioner in the amounts of $ 15,190.38 and $ 17,408.28 for the taxable years ended January 31, 1974, and January 31, 1975, respectively, representing imputed interest (at the rate of 5 percent per annum) on the funds advanced to the controlled entities. The respondent determined that this allocation was necessary to prevent the evasion of taxes or to clearly reflect the incomes of the petitioner and the controlled entities. Petitioner operated a retail department store in Buford's shopping center. Sometime before the latter part of 1972 it became evident that petitioner's business was slacking off because the shopping center's other tenants were not attracting enough customers. To ameliorate that situation, petitioner decided to open two retail stores in the center. One of the stores would sell records and tapes and would be known as Musicville, U.S.A., Inc. ("Musicville"). One of Philip Sunshine's friends, Alfred Bean ("Bean"), an individual who had been involved in the record business for many years, was to assist in this *169 endeavor.
Philip Sunshine and Bean knew one of the principals of ABC Record and Tape Sales Corp. ("ABC"), a wholesale record and tape distributing company. On December 1, 1972, petitioner, Bean, ABC and Musicville entered into a consignment agreement whereby ABC agreed to supply certain fixtures and inventory to Musicville on open account in exchange for (among other things) an option on all of Musicville's stock. In addition, a promissory note in the amount of $ 43,720.80 was executed by Musicville in favor of ABC. This note was guaranteed by Bean, petitioner and Philip Sunshine. In connection with the operation of Musicville's record business, petitioner made $ 28,767.63 in advances to Musicville from November, 1972, through January, 1974. These advances served the function of satisfying the obligations Musicville incurred in the formation of its record business. These advances were used for such expenses as payments for carpets, signs, paper, decorating, advertising, payroll and sales taxes. Some of the advances were also made on Musicville's behalf to ABC and Citizens and Southern National Bank, a bank which had loaned Musicville money. The advances made to Musicville by *170 petitioner were not evidenced by notes or secured by any collateral and were subject to no maturity dates. Musicville was incorporated in Georgia on November 9, 1972. Musicville stayed in operation as a retail records and tapes store for 24 months. It had its own bank account and a loan was secured in its name. It filed Georgia State Sales and Use Tax returns and Federal Employment Tax returns in the name of Musicville, U.S.A., Inc. for the entire period. Separate books and records were maintained for it. An unsigned pre-incorporation subscription agreement of Musicville provided for the following capital structure and method of payment: No. of Shares
Aggregate Price
Consideration
Alfred Bean
500
$ 500.00
Services
Sunshine Department
Stores, Inc.
500
$ 500.00
$ 500.00
No capital was ever actually contributed to Musicville by petitioner other than the advances involved herein which were made by petitioner. No other pre-incorporation subscription agreement was ever executed. No stock was ever officially issued. Corporate organization minutes were also prepared but not signed. Bean operated Musicville on a full-time basis throughout the duration of its active business life. He received *171 no salary for these services. Petitioner and Bean held themselves out as 50 percent owners of Musicville. The December 1, 1972, agreement between Bean, petitioner, Musicville and ABC states: Musicville represents that its total issued and outstanding shares of stock are 100 shares, 50% of which shares are owned by Bean and 50% which shares are owned by Sunshine. Neither ABC nor Citizens and Southern National Bank attempted to collect any of the Musicville obligations from Musicville or from any of the guarantors other than petitioner. After advancing funds to satisfy these obligations in part, petitioner did not pursue reimbursement from either Musicville or any of the other guarantors. Petitioner's advances to Musicville were claimed as an ordinary loss on its tax return for the taxable year ending January 31, 1975. In his statutory notice of deficiency, the respondent determined that the payments made to or for the benefit of Musicville represented contributions to capital paid with respect to petitioner's stock holdings. The respondent further determined that any loss sustained from the payments represented a long-term capital loss rather than an ordinary loss. OPINION The *172 first issue for decision is whether respondent abused the discretion granted to him under section 482 when he imputed interest income to petitioner on interest-free advances which petitioner made to various related entities. Respondent contends that petitioner and the other entities in question were commonly controlled and that the failure by petitioner to charge interest evinces that the advances did not comport with the arm's-length standard set forth in section 1.482-1(b)(1), Income Tax Regs. Specifically, respondent relies upon section 1.482-2(a), Income Tax Regs., which was upheld by this Court in Latham Park Manor, Inc. v. Commissioner, 69 T.C. 199 (1977) (Reviewed by the Court), affd. without published opinion 618 F.2d 100 (4th Cir. 1980), and which reads in part as follows: Section 1.482-2. Determination of taxable income in specific situations. (a) Loans or advances--(1) In general. Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest, or charges interest at a rate which is not equal to an arm's length rate as defined in subparagraph *173 (2) of this paragraph, the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance. (2) Arm's length interest rate--(i) In general. For the purposes of this paragraph, the arm's length interest rate shall be the rate of interest which was charged, or would have been charged at the time the indebtedness arose, in independent transactions, with or between unrelated parties under similar circumstances. All relevant factors will be considered, including the amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans. Petitioner has raised a variety of objections concerning respondent's attempt to impute interest income under section 482: that respondent must prove a design or intent to shift income for a tax advantage before section 482 can be invoked; that the same interests do not control or own petitioner and the four borrowing entities; that section 482 cannot be utilized to impute interest where the barrower would not have been able to pay interest; that petitioner received non-monetary *174 consideration from the other entities; that respondent's interest imputation is inconsistent with this Court's decision in Dean v. Commissioner, 35 T.C. 1083 (1961) (Reviewed by the Court), and its progeny; that the advances to the Estate are not subject to section 482 since it was not engaged in a trade or business; and, finally, that $ 13,000 of the advances to Holding actually represented the purchase price of Holding stock and, to that extent, a section 482 allocation is inappropriate. Section 482 provides the Commissioner with broad authority [i]n any case of two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests,… [to] distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. Regarding the control or ownership requirement of section 482, the thrust of petitioner's argument appears to be that the same individuals do not possess *175 the identical beneficial ownership interests in each of the entities herein involved. However, section 482 employs the term "indirectly," which suggests the application of attribution principles (see Bittker and Eustice, Federal Income Texation of Corporation's and Shareholders, par. 15.06, p. 15-20 (4th ed. 1979)); and the relevant language of section 482 is phrased in the disjunctive: either common ownership or control, directly or indirectly, will suffice. Thus record ownership is not determinative. Collins Electrical Co. v. Commissioner, 67 T.C. 911, 919 (1977). Section 1.482-1(a)(3) provides that [t]he term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted. The "reality of the control" exercised by Philip Sunshine in the case before us convinces us that the organizations, etc., under scrutiny are "controlled directly or indirectly by the same interests," as required for application of section 482. As we said in Collins Electrical Co., supra, *176 actual control, not record ownership, is determinative as to whether the requisite control exists. The record in this case demonstrates conclusively that Philip Sunshine was the guiding genius, not only of petitioner, but also of Plaza, Holding, Clairmont and the Estate, and as such exercised actual control well within the paramenters of section 482 and the definition of the term "controlled" contained in Treas. Reg. section 1.482-1(a)(3), supra. We have found as a fact that Philip directed the day-to-day affairs of petitioner, Holding, Plaza, Clairmont and the Estate. In addition, Philip was a fiduciary of his father's Estate, which owned all of petitioner's voting stock. Furthermore, the will provided that upon distribution Philip was to receive 51 percent of such voting stock, and his sons were to receive an additional 19 percent. During the years in issue, all of the voting stock of Plaza was held by the Estate, of which Philip was a fiduciary. The Estate, petitioner, Philip and his mother owned almost all of Holding's stock. Philip, during the years in question was directly and indirectly a substantial owner and a managing partner of Clairmont. It is thus indisputable that *177 Philip was in position to, and in fact did, exercise the requisite control to trigger the application of section 482 to the facts of this case. To cite but one further example, the manner in which the advances to Clairmont and the Estate were repaid in order to reduce petitioner's outstanding debt at year-end is reflective of the control that was exercisable virtually at will by Philip Sunshine over the entities. Consequently, we must reject petitioner's argument regarding a want of common control. Petitioner also maintains that, in order to utilize section 482, respondent must prove a design or intent to shift income for a tax advantage. However, this argument is inconsistent with the regulations under section 482, which provide: (c) Application. * * * The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. (Emphasis added.) [Section 1.482-1(c), Income Tax Regs.] Moreover, this contention appears *178 to stem from an erroneous reading of Brittingham v. Commissioner, 598 F.2d 1375 (5th Cir. 1979) and its companion case, Dallas Ceramic Co. v. United States, 598 F.2d 1382 (5th Cir. 1979), which petitioner has relied on heavily in advancing this argument. In both of those cases, the controlling ownership interests in the two relevant corporations were held by different groups of individuals; additionally, two different individuals controlled each entity's day-to-day corporate affairs. As a result, the government was required to demonstrate that income was arbitrarily shifted in order to rely on the presumption of control contained in section 1.482-1(a)(3), Income Tax Regs. Such is not the case here. Respondent was not arbitrary in allocating interest income to petitioner in this case. We have found that all of the relevant entities were controlled by Philip Sunshine and the authority to allocate the interest which is at issue is contained in section 1.482-2(a)(1), Income Tax Regs., a regulation which was upheld by this Court in Latham Park Manor, Inc. v. Commissioner, supra.The allocation is necessary to prevent "milking" of profits since there is a direct relationship between *179 petitioner's failure to report interest on the advances and its resulting lower earnings and taxes. Since petitioner's related entities reported little or no taxable income, any offsetting interest deduction would not have resulted in a wash when the income of the entities is viewed in the aggregate. See Latham Park Manor, Inc. v. Commissioner, supra at 213. In spite of the prima facie case which has been made for a section 482 allocation, petitioner argues that that section is inapplicable where the controlled borrower could not have paid interest, citing Pitchford's, Inc. v. Commissioner, T.C. Memo. 1975-75. In that case an accrual basis taxpayer loaned money to a controlled entity, Cappco, interest-free. The taxpayer argued that respondent was precluded from allocating income to it under section 482 because Gappco's financial situation was so unstable that even had the loans in question provided for the payment of interest, accrual of such income by the taxpayer (as a matter of tax accounting) would not have been mandated. Respondent conceded this legal result but disputed the underlying factual premise, namely, Gappco's financial instability. This Court accepted respondent's *180 concession in that case but expressly refrained from confirming respondent's concession as a legal matter. As a consequence, the controversy was limited to the factual issue of Gappco's financial condition. The Court found that the taxpayer satisfied its burden of proving Gappco's financial instability and respondent was accordingly precluded from making a section 482 allocation. In this case respondent does not concede the issue of whether a borrower's inability to pay interest would preclude an interest imputation. In any event we need not address this point since the present facts do not raise it. We have found as a fact that each entity could have acquired outside financing and paid any required interest. Respondent called as an expert witness Dr. Albert H. Clark to rebut Philip Sunshine's testimony regarding the borrowing entities' negative cash flows, illiquidity and the inability to acquire outside financing or pay any resulting interest. Dr. Clark, who received a Ph.D. in Economics from the Wharton School of Business, is a full-time professor who teaches corporate finance and has been a frequent consultant to both businesses and courts of law. He was a credible and impressive *181 witness and his analysis of the borrowing entities' respective financial conditions was convincing. Dr. Clark testified that, in his opinion, each entity could have acquired outside financing and paid interest on the loans. In reaching this conclusion Dr. Clark reasoned that, in determining each borrowing entity's book value, a prudent lender would have excluded and liabilities owing to related entities or to individuals who had ownership interests in the entity in question; a lender would have viewed these liabilities as really part of each entity's equity. The resulting book value net worth for each entity would then have to be further adjusted to reflect the fair market value of its major assets (as opposed to historical cost). Dr. Clark testified that based on these considerations, a prudent lender would have approved additional financing for the entities in question (although the lender would probably require subordination of the related entity and owner liabilities). Dr. Clark further testified that the entities' cash flow could have been improved by either renegotiating their mortgages or by increasing the rental charges for the properties leased (or both). The improved *182 cash flow would thus insure that each entity would have the capability of making both the principal and interest payments. In making this analysis Dr. Clark used as the prevailing market interest rates ranges between 8.75 percent and 10.25 percent and between 11.25 percent and 12.75 percent for the respective taxable years ending January 31, 1974 and 1975. In this regard it should be noted that respondent's interest allocation was based on an annual rate of only five percent. We are aware that, aside from the conclusions contained in the expert reports, Dr. Clark did not touch on the subject of the borrowing and interest-paying abilities of the Estate. Regardless of this, the unconvincing nature of Philip Sunshine's unsupported and conclusory testimony and a perusal of the Estate's assets which included all of petitioner's voting stock and approximately 65 percent of its non-voting stock, convince us that the Estate also had adequate borrowing capacity. The tax return which the Estate filed indicates that it also held five different parcels of real property with a total value of $ 399,600. Only one parcel, worth $ 2,750, was listed as vacant. Thus it is evident that the Estate *183 had a potential source for a significant amount of rental income and could have borrowed funds and paid interest, particularly at the five percent rate imposed by respondent. The evidence thus supports a finding that all of the borrowing entities could have obtained outside financing and paid interest. Petitioner next argues that to allow respondent to impute interest income under section 482 would be inconsistent with this Court's decision in Dean v. Commissioner, 35 T.C. 1083 (1961) (Reviewed by the Court), and the subsequent line of cases following Dean. In the Dean case, this Court held that a borrower does not realize taxable income as a result of receiving an interest-free loan. This, of course, is not the present situation where respondent seeks to impute interest income to the lender, not the borrower. In any event, Dean does not warrant the conclusion petitioner advances. In contrast to the interest-free loan situation involving unrelated taxpayers; e.g., Dean, specific authorization for respondent's imputation of interest income to petitioner is contained in section 482 and the regulations thereunder. Indeed, in Crown v. Commissioner, 67 T.C. 1060, 1065 (1977) (Reviewed *184 by the Court), affd. 585 F.2d 234 (7th Cir. 1978), a case involving an interest-free loan in the context of the gift tax, this Court specifically alluded to section 482 and section 1.482-2 of the regulations as an adequate congressional and regulatory authorization vis-a-vis the respondent's power to impute interest in a case such as this. Accordingly, we hold that the Dean case does not here preclude the allocation of interest income to petitioner under section 482. Petitioner also maintains that it received a quid pro quo from the related entities and thus it need not have charged interest. According to petitioner, the loans helped to insure the stability of the related lessors, and petitioner was thus able to operate its stores in the shopping centers at favorable rental rates. The testimony of petitioner's President, again unsupported by other evidence, was that petitioner received certain benefits from making the interest-free loans. Such vague benefits do not qualify as an offset against imputed interest under the applicable regulation. Section 1.482-1(d)(3), Income Tax Regs., provides: (3) In making distributions, apportionments, or allocations between two members of a *185 group of controlled entities with respect to particular transactions, * * * the district director shall * * * consider the effect of any * * * non-arm's length transaction between them in the taxable year which, if taken into account, would result in a setoff against any allocation which would otherwise be made, provided the taxpayer is able to establish with reasonable specificity that the transaction was not at arm's length and the amount of the appropriate arm's length charge. For purposes of the preceding sentence, the term arm's length refers to the amount which * * * would have been charged in independent transactions with unrelated parties under the same or similar circumstances considering all the relevant facts * * *. (Emphasis added.) Assuming arguendo that petitioner contends that it obtained bargain leases in exchange for the interest-free loans, the extent of the bargain cannot be used as an offset because neither the arm's-length amounts nor the fact or amounts of the leases have been established. Petitioner next strenuously maintains that the advances to the Estate are not subject to section 482 since the Estate was not engaged in any business activity. [4] However, *186 the statute uses the term "organization" in the disjunctive ("organizations, trades or businesses" (emphasis supplied)). In addition, section 1.482-1(a)(1), Income Tax Regs., includes estates within the term "organization." This Court has noted that section 482 is not to be narrowly construed given its broad, comprehensive terms. Ach v. Commissioner, 42 T.C. 114, 125 (1964), affd. 358 F.2d 342 (6th Cir. 1966). We have found as facts that the Estate held, during the years in issue, all of the voting stock of petitioner and Plaza and the lawrgest bloc of the only class of outstanding stock of Holding. 4a The decedent's wife, Lillie, his son, Philip and a third party were the fiduciaries under the will, thus creating a network of control between the Estate and the *187 corporations. (Clairmont, the partnership, was controlled directly by Lillie and Philip.) Under the provisions of the will, Philip is, on termination of the Estate, to receive 51 percent of the voting stock of petitioner. Lillie, if living, or if not, Philip, is to receive all of the voting stock of Plaza.Both share substantially in the residue. The factual setting above-outlined takes this case beyond "[t]he mere lending of money by an individual to his controlled corporation," which certain leading commentators have opined "ought not to constitute a 'business' transaction so as to invoke [section] 482…" see Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 15.06, p.15-20, fn. 35 (4th ed. 1979). In Asiatic Petroleum Co. v. Commissioner, 79 F.2d 234, 237 (2d Cir. 1935), it was argued that section 45 of the 1939 Code (sec. 482's predecessor) did not apply on the grounds that a parent corporation was a pure holding company and so not engaged in a *188 trade or business. The Second Circuit, speaking through Judge Swan, nevertheless held: But if it be assumed that [taxpayer] was purely a holding company and conducted the business of dealing in petroleum products solely through subsidiaries, we think this was a "business" within the meaning of section 45. It can hardly be thought that Congress intended to leave holding companies free to avoid taxes and subjected only their subsidiaries to the terms of the statute. We think a similar rationale applies to the Estate of Harry Sunshine in this case. Clearly the Estate, with its substantial blocs of stock in the various corporations, was an essential mechanism whereby Philip Sunshine managed the affairs of the various related entities. Whether the utilized entity is a corporation, as in Asiatic Petroleum, or an estate, as in this case, the result is the same. Assuming only for the sake of argument (and which we expressly do not here decide) that section 482 does in fact require that all of the related entities be engaged in a trade or business, 4b we hold that, in a case such aws this, where an entity participates extensively in the business of other entities in which it holds a controlling *189 or substantial interest, that participation constitutes a "business" for purposes of section 482. Respondent's allocation of interest income to petitioner from the Estate is accordingly approved. Petitioner also contends that $ 13,000 of the approximately $ 23,000 which was advanced by petitioner to Holding actually represented the acquisition cost for Holding stock and that the continued listing of the $ 23,000 on both petitioner's and Holding's books as debt was an error. Petitioner relies specifically on section 1.482-2(a)(3), Income Tax Regs., which provides that the Commissioner's authority to impute interest to the lender under section 482 does not apply to alleged indebtedness which in fact represents a contribution to capital.We do not think the evidence adduced, i.e., the testimony of Philip Sunshine, satisfies petitioner's burden of proof, particularly in a section 482 case such as this; petitioner has not proved that respondent was arbitrary and capricious regarding this facet of his allocation. See Ballentine Motor Company, Inc. v. Commissioner, 321 F.2d 796 (4th Cir. 1963).Philip Sunshine's bald testimony, unsupported by any *190 objective supporting evidence such as corporate books and records, the testimony of disinterested witnesses, etc., that the continued listing on the books of both Holding and petitioner was in error, does not establish a 1966 purchase of Holding stock in any amount. In sum, we sustain respondent's allocation of interest income to petitioner for each of the years in issue. The remaining issue for decision concerns the nature of the loss which petitioner claimed by virtue of the advances made to Musicville, a corporation formed in November of 1972, to operate a record store in the Buford-Clairmont Mall in Atlanta. Musicville continued its operation of the business until November, 1974. During this time petitioner made $ 28,767.63 in advances either to or on behalf of Musicville; on its return for the taxable year ended January 31, 1975, petitioner deducted this amount as an ordinary loss.
It is apparent to us that the advances to Musicville were in the nature of capital contributions. The facts indicate that they were made without any expectation of repayment: Philip Sunshine testified that shortly after Musicville began its business operations, it was obvious that the store was *191 not going to be a profitable enterprise. The absence of any reasonable expectation of repayment strongly suggests that the advances were intended as risk capital rather than loans. Hudson v. Commissioner, 31 T.C. 574, 583 (1958). Moreover, all of the other factors which have tradit onally been considered by the courts in determining the nature of purported loans indicate the advances' capital nature. See, e.g., United States v. Henderson, 375 F.2d 36, 40 (5th Cir. 1967), cert. denied 389 U.S. 953 (1967). Musicville had no other capital; the advances bore no interest, had no maturity date and were not evidenced by any document; they were used by Musicville, to acquire essential assets, the basic start-up requirements of inventory and fixtures, and the advances were effectively subordinated to the claims of Musicville's other creditors. All in all, it would be difficult indeed for us to characterize these advances as something other than capital contributions to Musicville. [5] *192 Petitioner, however, has advanced two diametrically opposite arguments in support of its position that it is entitled to an ordinary loss deduction. Petitioner first argues that although Musicville was formed as a corporation, the corporate entity was abandoned since various corporate papers were never executed and no stock was issued. Petitioner thus asserts that the record and tape operation conducted by Musicville was actually run as a department or division of its own operations. The fact remains, however, that Musicville was a corporation under Georgia law and engaged in business. There is simply no basis for disregarding its existence as a separate taxable entity. Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). Petitioner also argues that if Musicville is found to constitute a separate taxable entity for tax purposes, then petitioner is entitled to an ordinary loss under section 165(g)(3) for the reason that Musicville was petitioner's wholly-owned subsidiary. *193 We find no merit in petitioner's argument that Musicville was petitioner's wholly-owned subsidiary for purposes of section 165(g)(3). Although petitioner contributed all of Musicville's capital, the understanding between Bean and petitioner was that they would share equally in the enterprise. Even though petitioner contributed all of the capital, Bean worked for nearly two years and ran the store without compensation. Bean's contributions as a service participant for over two years is highly probative that he was an equal owner in the enterprise. Given the pre-incorporation subscription agreement and the extent and duration of Bean's services, petitioner clearly has not satisfied its burden of proving that it owned at least an 80 percent stock interest in Musicville. Petitioner, citing Putnam v. Commissioner, 352 U.S. 82 (1956), also argues that to the extent that it made payments to Citizens and Southern National Bank and ABC, as guarantor of Musicville's obligations, section 166 controls the nature of the loss. While it is true that Putnam held that the loss arising from a guarantor's payment (upon the primary debtor's inability to pay) is governed by the section 166 bad debt *194 rules, it has been held that guarantor payments can nonetheless constitute capital contributions. Plantation Patterns, Incorporated v. Commissioner, 462 F.2d 712 (5th Cir. 1972). See also Santa Anita Consolidated, Inc. v. Commissioner, 50 T.C. 536, 550 (1968); Bittker and Eustice, Federal Income Taxation of Corporations and Shareholder, par. 4.10, p.4-42, (4th ed. 1979). In the instant case the capital nature of petitioner's guarantee is reasonably clear: the necessity of other capital contributions was consequently supplanted since Musicville was able to acquire assets essential to its operations, records and tapes. Philip Sunshine readily admitted that all of Musicville's creditor's looked primarily to petitioner for payment. The guaranty payments were essentially a means for petitioner to make indirect capital contributions.Petitioner's reliance on Putnam to negate the capital character of its guaranties is thus inapposite. Petitioner also avers that a section 162 deduction is allowable for the guaranties as they were made in order to protect petitioner's credit and business reputation, citing Milbank v. Commissioner, 51 T.C. 805 (1969). The conclusory statement to this effect *195 offered by Philip Sunshine at trial does not, in our mind, establish with sufficient specificity the extent to which petitioner's reputation and credit standing would have been damaged by virtue of a Musicville default. Compare Milbank v. Commissioner, supra.There has not been enough evidence produced to support a finding in that regard. Finally, petitioner contends that it acquired its interest in Musicville as an integral part and necessary act in the conduct of its business and the transaction is consequently within the purview of the Corn Products doctrine. Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955). Although petitioner's investment in Musicville may well have been for the purpose of increasing the number of visitors who frequented the Buford Mall and thus could potentially increase petitioner's retail business, we decline to consider whether the instant case falls within the scope of that doctrine. Petitioner did not raise the issue of the application of Corn Products until its opening brief; it was not mentioned in either its petition or opening statement at trial. Even though it is questionable whether the evidence adduced demonstrates compliance with *196 the standard set forth in Corn Products, we will not consider the issue because of the untimely raising thereof. Respondent, being unaware that such an argument was to be made in support of an ordinary loss deduction, was prevented from presenting evidence he otherwise might have presented, evidence which could show that the Musicville operation was not integrally related to petitioner's regular business functions. See Estate of Horvath v. Commissioner, 59 T.C. 551, 555-556 (1973). Accordingly, we hold that the $ 28,767.63 in advances to Musicville are capital contributions, and thus the losses arising therefrom are subject to the capital loss limitations contained in section 1211. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise specifically indicated.↩
2. The stipulation which the parties submitted, erroneously listed this figure as $ 348,165.64.↩
3. These figures are derived from the stipulation which the parties submitted herein. The stipulated schedule contained no information with respect to any advances to Clairmont or the Estate between 1/31/74 and 1/31/75 or between 1/31/75 and 2/1/75. Since the parties have stipulated the February 1, 1974 and February 1, 1975 balances for Clairmont and the Estate, we will assume that advances in the respective amounts of such balances were made within the respective preceding months.↩
4. In connection with this contention petitioner directs our attention to Section 45 of the Revenue Act of 1934, ch. 277, 48 Stat. 680, 695, which added the term "organization" to the predecessor to section 482 in order "to remove any doubt as to the application of this section to all kinds of business activity↩." (Emphasis supplied.) H.Rept. No. 704, 73d Cong., 2d Sess., 24 (1934), reprinted in 1939-1 C.B. (Part 2) 554, 572.
4a. The Estate was an entity of long duration. It had been in existence for over five years during the first year at issue, and was to continue until the youngest grandchild of the testator attained age 23.↩
4b. Cf.Bittker and Eustice, supra↩ at 15-20.
5. Petitioner's argument that respondent's position with respect to the Musicville advances is inconsistent with the position taken vis-a-vis his section 482 allocation is without merit. The advances to Muscville are part of a completely separate transaction. Moreover, as to the section 482↩ allocation, petitioner maintained that only $ 13,000 of the advances to Holding represented an equity interest in that entity.