Robert M. BRITTINGHAM,
Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

DALLAS CERAMIC CO.,
Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

Jeanne C. BRITTINGHAM,
Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

Juan R. BRITTINGHAM, Petitioner-Appellee, Cross-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant, Cross-Appellee.

Nos. 77–1020, 77–1021, 77–1022 and 77–1023.

United States Court of Appeals, Fifth Circuit.

July 23, 1979.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Act. Chief, App. Sec., U. S. Dept. of Justice, Washington, D. C., Stuart E. Siegel, Chief Counsel, Internal Revenue Service, Washington, D. C., Jonathan S. Cohen, George G. Wolf, Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellant.

Ethan B. Stroud, Cameron Dee Sewell, David A. Ives, Dallas, Tex., for petitioners-appellees.

Before WISDOM, COLEMAN and RONEY, Circuit Judges.

PER CURIAM:

This case together with its companion might furnish contrary argument to the reaction that taxpayers always do better in the district court, the Government in the Tax Court. Both cases concerned proper allocation of income between two corporations, Ceramica Regiomontana, Inc. and Dallas Ceramic Company, one of which manufactured and sold tile for resale to the other. The Commissioner of Internal Revenue found the two companies were commonly controlled and determined deficiencies and penalties for years 1963 through 1966. 26 U.S.C.A. § 482. Dallas Ceramic Company and individual taxpayers petitioned the Tax Court for a redetermination of tax liability for years 1963, 1964 and 1965. In these Tax Court cases the taxpayers won. For the year 1966, Dallas Ceramic Company paid the deficiency and sued for a refund in the district court. In the district court case the taxpayer lost. We here affirm the decision of the Tax Court, for the taxpayers, and reverse by separate opinion the district court's decision against the corporate taxpayer. *Dallas Ceramic Co. v. United States,* 598 F.2d 1382 (5th Cir. 1979).

Although we fully discuss the premises upon which we are reversing the district court, there seems little point in our exhaustively reviewing the arguments in this case. In our view, the facts found by the Tax Court in *Brittingham v. Commissioner,* 66 T.C. 373 (1976), are not clearly erroneous, *Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), the law was properly applied, and the result

correct. In order that this decision and the decision on the district court appeal will be as helpful as possible to those few technicians for whom these cases may provide some guidance, we append portions of the Tax Court decision to this opinion.

■■■ Here, we need say but this. On appeal, the Government has argued these points: the Commissioner's price allocation was not arbitrary, unreasonable or capricious; the Tax Court erred as a matter of law in holding that the invoice price of Ceramica's tile was the arm's length price when the taxpayers introduced evidence to show the true arm's length price; Dallas Ceramic and Ceramica were controlled, directly or indirectly, by the same interests within the meaning of § 482; the excessive payments for Ceramica's tile, diverted to Juan Brittingham, constituted constructive dividends to him from Dallas Ceramic; and finally, that the underpayments of tax by Dallas Ceramic and Juan Brittingham were due to fraud within the meaning of § 6653(b) of the Code. The taxpayers' brief meets these arguments head-on, and convinces us that the Tax Court dealt correctly with each argument made, and should be affirmed.

AFFIRMED.

## APPENDIX

## OPINION

1. *Adjustments in Prices Paid by Dallas Ceramic*

Of the many issues to be decided in this case, the primary one is whether, pursuant to section 482, the Commissioner may allocate substantial amounts of income to Dallas Ceramic from Ceramica by adjusting Dallas Ceramic's cost of goods sold.

Section 482 provides:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The purposes of section 482 and the Commissioner's authority to effectuate such purposes were described in *Pauline W. Ach,* 42 T.C. 114, 125–126 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899, 87 S.Ct. 205, 17 L.Ed.2d 131 (1966), where it was said:

Respondent may allocate income under section 482 in order to prevent "evasion of taxes or clearly to reflect the income." The legislative history of section 482 indicates that it was designed to prevent evasion of taxes by the arbitrary shifting of profits, the making of fictitious sales, and other such methods used to "milk" a taxable entity. * * * The Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. * * *

See *Marc's Big Boy-Prospect, Inc.,* 52 T.C. 1073, 1092–1093 (1969), affd. sub nom. *Wisconsin Big Boy Corp. v. Commissioner,* 452 F.2d 137 (7th Cir. 1971); *T.V.D. Co.,* 27 T.C. 879, 884 (1957); H.Rept.No.2, 70th Cong., 1st Sess. (1927), 1939–1 C.B. (Part 2) 384, 395; S.Rept.No.960, 70th Cong., 1st Sess. (1928), 1939–1 C.B. (Part 2) 409, 426.

By using the standard of an uncontrolled taxpayer to determine the controlled taxpayer's "true taxable income," section 482 equalizes the treatment of controlled and uncontrolled taxpayers and prevents the artificial shifting of income between related

businesses. *Huber Homes, Inc.*, 55 T.C. 598, 605 (1971); see *Baldwin-Lima-Hamilton Corp. v. United States*, 435 F.2d 182, 185 (7th Cir. 1970); *Kerry Investment Co.*, 58 T.C. 479, 484 (1972), affd. on this issue 500 F.2d 108 (9th Cir. 1974); *Asiatic Petroleum Co. (Delaware) Ltd.*, 31 B.T.A. 1152 (1935), affd. 79 F.2d 234 (2d Cir. 1935), cert. denied 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 459 (1935); sec. 1.482–1(b)(1), Income Tax Regs.

The Commissioner contends that Dallas Ceramic and Ceramica were owned or controlled by the same interests and that the price Dallas Ceramic paid for the Dal-Monte tile purchased from Ceramica was not an arm's length price. Thus, he argues that he properly reduced Dallas Ceramic's "cost of goods sold" to reflect what he alleges was the uncontrolled price of the tile to prevent the evasion of taxes. Petitioner Dallas Ceramic argues that the Commissioner acted without authority in making the section 482 allocation, since it was not owned or controlled by the same interests as Ceramica and since it paid an arm's length price for the Dal-Monte tile. We agree with both positions urged by the petitioner Dallas Ceramic.

A. *Common Ownership or Control*

■ For section 482 to be applied, there must be two or more organizations, trades, or businesses "owned or controlled directly or indirectly by the same interests." Section 1.482–1(a)(3) of the Income Tax Regulations defines "controlled" to include:

> any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

Actual control and not record ownership determines whether the statute applies. See *Pauline W. Ach,* 42 T.C. at 125; *Grenada Industries, Inc.,* 17 T.C. 231, 254 (1951), affd. 202 F.2d 873 (5th Cir. 1953), cert. denied 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed.

345 (1953). The record in this case clearly demonstrates that Dallas Ceramic and Ceramica were not owned or controlled by the same interests within the meaning of section 482.

During the years in issue, Juan, his wife, and Roberta owned all the stock of Ceramica, except for a few qualifying shares. Juan controlled Roberta's shares pursuant to a power of attorney, and she took no part in the business affairs of the company. Juan was Ceramica's director general and exercised complete control over its operations and policies. Robert and his immediate family neither owned any stock in, nor exercised any control over, the operations of Ceramica.

During most of the years in issue, Robert and his children owned 37 percent of the stock of Dallas Ceramic, while Juan, his wife, and children owned an equal amount. The balance of the stock was owned by uncles, an aunt, and cousins of Robert and Juan. Robert and Juan each controlled the interests of his immediate family in Dallas Ceramic. However, neither Juan alone, nor together with his immediate family, did or could exercise control over the business policies of Dallas Ceramic.

The Commissioner apparently does not argue that either Robert or Juan alone owned or controlled the two companies. Rather, he maintains that the "family unit" of Roberta, Juan, and Robert constitute the "same interests" necessary for the application of section 482, and that this "family unit" owns or controls both corporations. The petitioners agree that the members of such "family unit" collectively owned or controlled both corporations but vigorously deny that the family unit constitutes the "same interests."

The term "same interests" is not defined in the statute or regulations. Its meaning must be determined in light of the congressional purpose in enacting section 482. Such section is remedial in nature and must not be narrowly construed to frustrate the legislative intent. *Pauline W. Ach, supra.*

Section 482 was enacted to prevent the artificial shifting of income between controlled taxpayers to avoid Federal taxes. See H.Rept.No.2, *supra;* S.Rept.No.960, *supra.* In using the term "same interests," Congress apparently intended to include more than "the same persons" or "the same individuals." Different persons with a common goal or purpose for artificially shifting income can constitute the "same interests" for the purposes of the statute. Cf. *Rishell Phonograph Co.,* 2 B.T.A. 229, 232–233 (1925). Thus, it is not necessary that the same person or persons own or control each controlled business before section 482 can be applied, but there must be a common design for the shifting of income in order for different individuals to constitute the "same interests." Here, the two businesses were owned and controlled by different individuals, and it is clear there was no design to shift income among them.

Without doubt, Roberta did not constitute the "same interests" controlling Dallas Ceramic and Ceramica since she owned no interest in Dallas Ceramic and exercised no control over the affairs of either corporation. Moreover, Robert and Juan, although brothers, each had his own family, and each was financially independent of the other. Any overpayment made by Dallas Ceramic to Ceramica would have been completely contrary to Robert and his family's financial interest since they had no interest in Ceramica and would have received no benefits from such overpayments. While it is true that Juan paid Robert's expenses on two joint hunting trips, the payment of such expenses would not be sufficient inducement to cause Robert to arrange for Dallas Ceramic to overpay for the Dal-Monte tile. To believe that Robert would be a part of a plan to divert $1.5 million from a corporation in which he and his children owned a 37-percent interest to a corporation in which his immediate family had no interest strains all credulity.

The many cases cited by the Commissioner do not establish the rule for which he argues. In *South Texas Rice Warehouse Co.,* 43 T.C. 540 (1965), affd. 366 F.2d 890 (5th Cir. 1966), cert. denied 386 U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 454 (1967), four families owned equal interests in Warehouse and Enterprise. The ownership within each family group varied in that the children owned a larger share of each family's interest in Enterprise. We held that both businesses were controlled by the "same interests" and found that the variation in intra-family ownership was not significant, since the purpose of forming Enterprise was to effectuate a short-term reallocation of income among the family members of certain units. However, the facts of that case are significantly different than those of this case. In that case, each family group owned an equal interest in each business, and the variation of ownership within each family group was a result of a plan by the fathers in three of the families to shift income to their children. In this case, the families of Juan and Robert did not own proportionate interests in both corporations, and there was never a plan to shift income from Robert to Juan. Their fraternal relationship alone is not sufficient to infer that there existed any plan to shift income between them.

The Commissioner also relies upon *Charles Town, Inc. v. Commissioner,* 372 F.2d 415 (4th Cir. 1967), affg. a Memorandum Opinion of this Court, cert. denied 389 U.S. 841, 88 S.Ct. 69, 19 L.Ed.2d 104 (1967), to support his contention that Juan and Robert constitute the "same interests." In *Charles Town,* two brothers equally owned and controlled Fairmont and equally controlled Charles Town, although they owned very little of it. Income was shifted from Charles Town to Fairmont. We found that the two businesses were controlled by the "same interests." The Commissioner argues that the facts of the present case are analogous. However, in *Charles Town,* the brothers shared control of Charles Town and shared ownership and control of Fairmont to which the income was shifted; whereas, in this case, Robert and his family

had no interest in Ceramica to which the Commissioner claims income was shifted. In view of Robert's lack of interest in Ceramica, we can find no reason for him to participate in a plan to shift income to that corporation, and accordingly, the *Charles Town* case is also not apposite.

The other cases relied upon by the Commissioner also involve significantly different facts. See *Advance Machinery Exch. v. Commissioner,* 196 F.2d 1006 (2d Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 344 U.S. 835, 73 S.Ct. 45, 97 L.Ed. 650 (1952); *Jesse E. Hall, Sr.,* 32 T.C. 390 (1959) affd. 294 F.2d 82 (5th Cir. 1961); *Friedlander Corp.,* 25 T.C. 70 (1955); *Grenada Industries, Inc., supra.* In each case, the fact that different persons were related was not the sole basis for determining that the interests involved were the same; there also was evidence indicating that income was arbitrarily shifted. Each case involved either paternal or marital relationships, not fraternal relationships. Finally, in each case, the same people either owned or controlled an interest in each controlled business.

In his brief, the Commissioner cited a number of examples of transactions that occurred between Dallas Ceramic and Ceramica, in which he claimed that one of the businesses conferred special benefits on the other and which therefore reflect a plan to divert income from one business to the other. However, none of such examples provide any evidence that income was shifted to Ceramica as part of a common purpose or scheme. The business relationships between the two corporations were extensive, and it was in the best interest of each of them to cooperate in the production and sale of high quality tile. The alleged preferences given to Dallas Ceramic were miniscule compared to the amount of income which the Commissioner claimed was improperly diverted to Ceramica. Robert appears to have been a successful businessman, and the transactions to which the Commissioner refers would clearly not be sufficient to have caused him to divert more than $1.5 million from a corporation in which he and his family owned a 37-percent interest.

## B. *Arm's Length Price*

■ We are also convinced that the Commissioner acted unreasonably in determining that the customs value constituted an arm's length price for the sale of the Dal-Monte tile to Dallas Ceramic.

Section 1.482–2(e)(1)(i) of the Income Tax Regulations provides in part:

> Where one member of a group of controlled entities * * * sells * * * tangible property to another member of such group * * * at other than an arm's length price * * *, the district director may make appropriate allocations between the seller and the buyer to reflect an arm's length price for such sale * * *. An arm's length price is the price that an unrelated party would have paid under the same circumstances for the property involved in the controlled sale. * * *

The regulations provide three basic methods for determining the arm's length price: the comparable uncontrolled price method, the resale price method, and the cost-plus method. If there are comparable uncontrolled sales, the comparable uncontrolled price method must be used, since it is the most accurate method of establishing an arm's length price. If there are no comparable uncontrolled sales, the resale method must be used if the requirements for its standards are met, since it is the method next most accurate in determining an arm's length price. If neither the comparable uncontrolled price method nor the resale method can be used, the cost-plus method is applicable. See sec. 1.482–2(e)(1)(ii), Income Tax Regs.

Uncontrolled sales are sales in which the seller and the buyer are not owned or controlled by the same interests. Uncontrolled sales will be considered comparable to con-

trolled sales if the physical property and circumstances involved in the two sales are identical or so nearly identical that the differences can be reflected in a reasonable number of adjustments to the uncontrolled price. In judging whether sales are comparable and what adjustments need to be made in prices, some of the facts to be considered are differences in the quality of the product, sale terms, intangibles associated with the sale, and the level of the market and the geographic market in which the sale takes place. Sec. 1.482–2(e)(1)(ii) Income Tax Regs.; see *American Terrazzo Strip Co.,* 56 T.C. 961, 972–973 (1971); *Woodward Governor Co.,* 55 T.C. 56, 64–68 (1970).

Obviously, the customs value is not one of the methods provided in the regulations for determining an arm's length price. Yet, in *Ross Glove Co.,* 60 T.C. 569, 605 (1973), we held that:

> Considering the similarity between the constructed value computation of Customs and the cost-plus method of section 482, we find that the markups used by Customs in computing the value of gloves imported by Ross Glove may serve as a basis for determining an arm's-length price under section 482. Such markups may be used because they are the best available evidence as to the amounts that a seller would receive to cover overhead and profit in an arm's-length sale.

The Commissioner argues that the customs value should likewise be used in this case. However, in *Ross Glove,* we relied upon the customs determinations because they were the best available evidence; here, the evidence convinces us that the customs determinations were not indicative of an arm's length price.

The Bureau of Customs based its valuation on the assumption that Dal-Monte tile was similar to Procesa tile in 1958. However, the evidence produced at the trial of this case clearly established that during the years 1963 through 1966, the Dal-Monte tile was far superior to Procesa tile in quality, availability, and reputation. Dal-Monte tile was available in many more shapes, colors, and styles than was Procesa. It was available in large and dependable quantities, thus allowing its distributors to provide better service to their customers. Dal-Monte tile met American grading standards, but Procesa did not. As a result, Dal-Monte tile was regarded as equal to all types of American-made tile, while Procesa was known as an inferior quality tile. These, together with other significant differences between the two tiles set forth in our Findings of Fact, make it entirely clear that the Dal-Monte tile was significantly more valuable than Procesa. This conclusion is corroborated by the fact that in 1970 Customs increased its valuation to equal the invoice price paid for the Dal-Monte tile.

The Commissioner argues that Dallas Ceramic and Ceramica made representations to the Bureau of Customs in 1958 that Dal-Monte and Procesa were similar and should be estopped from repudiating such statements. The petitioner, Dallas Ceramic, argues that the representations to the Bureau of Customs are not inconsistent with its position in this tax case; it asserts that the apparent inconsistencies are due to differences between the customs and tax laws. However, it is not necessary for us to resolve this dispute.

In the first place, the Commissioner has failed to lay a basis for invoking the doctrine of estoppel; he has not established that he relied upon the customs statement to his detriment, and in the absence of the establishment of such fact, there can be no estoppel. See *Ross Glove Co.,* 60 T.C. at 593; *Northport Shores, Inc.,* 31 B.T.A. 1013 (1935). Yet, in judging the credibility of the testimony given by Robert and Juan in this case, their representations to the Bureau of Customs must be taken into consideration. However, Dallas Ceramic did not rely simply upon the testimony of Robert and Juan; it produced a number of other disinterested witnesses who testified as to the differences in the relative values of

Procesa and Dal-Monte tile during the years in issue. We found the testimony of those disinterested witnesses to be altogether credible, and our conclusion was based on such testimony. Thus, our findings and holdings are based on the evidence of record in this tax case, and are made without having to decide whether some of the factual assertions made by Robert and Juan to the Bureau of Customs are reconcilable with their testimony in this case.

The Commissioner also relied upon the judgment of the district court with respect to Dallas Ceramic's alleged overpayments in 1966. He does not argue for the application of the doctrine of collateral estoppel, but he does seek to apply the doctrine of stare decisis. However, since the district court has ordered that case reopened for further evidentiary hearing, its judgment is not final and cannot be relied upon at this time. 1B Moore, Federal Practice, pars. 0.409[1], 0.416[1], 0.416[3] (2d ed. 1948).

Since the Customs determination of value in 1958 was based upon an erroneous assumption as to the relative values of the Procesa and Dal-Monte tile, we hold that the Commissioner's determination of an arm's length price for the sale of the Dal-Monte tile to Dallas Ceramic based on such value was unreasonable. The Customs determination established a formula for determining the value of the types of Dal-Monte tile not manufactured by Procesa. Since we have no explanation of the basis for such formula, and since the Customs determination of value was otherwise based on an erroneous assumption as to the relative values of Dal-Monte and Procesa tile, we also hold the Commissioner's determination to be unreasonable insofar as it relied upon such formula for determining the arm's length price of Dal-Monte tile.

In support of its position, the petitioner, Dallas Ceramic, produced the evidence of the prices at which the Dal-Monte tile was sold in Mexico. However, we found that evidence not to be convincing because those sales appear not to be comparable to the sales to Dallas Ceramic. The sales in Mexico were made in much smaller quantities and were apparently made to retailers. Even though we found that evidence not to be helpful, we are satisfied by the other evidence as to the relative values of the Procesa and Dal-Monte tile in the years in issue that the price paid by Dallas Ceramic for the Dal-Monte tile was reasonable and may be considered an arm's length price for purposes of section 482. Accordingly, we hold that no price adjustment was authorized by section 482.