AMHERST NURSING HOME, INC. vs. COMMONWEALTH.

Hampshire.   February 18, 1983. — September 26, 1983.

Present: GREANEY, KASS, & WARNER, JJ.

*Public Welfare. Administrative Law*, Regulations, Rate setting. *Nursing Home. Corporation*, Common ownership.

An individual's substantial stock ownership in two different corporations which operated nursing homes, coupled with her control of the policies and operations of both homes, presented issues of material fact as to whether the homes had been in common ownership for purposes of 106 Code Mass. Regs. § 456.703(E) (1979), so as to permit the Commonwealth to recoup from one home an alleged overpayment made some years earlier to the other for care of patients receiving public assistance.  [641-644]

CIVIL ACTION commenced in the Superior Court Department on February 13, 1980.

The case was heard by *O'Connor*, J., on motions for summary judgment.

*William L. Pardee*, Assistant Attorney General, for the Commonwealth.

*Paul T. Ford* for the plaintiff.

WARNER, J.   At issue is the application of a regulation (106 Code Mass. Regs. § 456.703[E] [1979]) of the Department of Public Welfare (DPW) which, in certain circumstances, allows DPW to recoup overpayments to nursing homes for the care of patients eligible for public assistance. The regulation provides: "If two or more facilities are, or were, under common ownership, and if one or more of the facilities is owed money by the Commonwealth, the Department may offset the provider's liability to the Department against the Department's liability to the provider."

We summarize the facts from the statement of agreed facts and those allegations of the amended complaint which

were admitted. Skole Nursing Home, Inc. (Skole), was a Massachusetts corporation which ceased doing business in December of 1974, and was dissolved in November of 1975 under the provisions of G. L. c. 156B, § 100. Skole had operated a nursing home and received payments from DPW for the care of patients eligible for public assistance. In 1979 and 1980, DPW determined that overpayments had been made to Skole in the years 1970, 1971 and 1974, in the total amount of $29,688.61.[1] At all relevant times Bettie Skole Kravetz was the president, treasurer, director and sole stockholder of Skole.

The plaintiff Amherst Nursing Home, Inc. (Amherst), is a Massachusetts corporation which has for many years operated a nursing home and received from DPW payments for the care of patients eligible for public assistance. At all relevant times prior to December 31, 1976, Kravetz owned 42% of the stock of Amherst.[2] Since January 1, 1977, Kravetz has owned 51.8% of the stock of Amherst.[3] As of the date of the statement of agreed facts, in 1981, she was also president and a director of Amherst. In 1979 and 1980 DPW deducted from a payment due Amherst as a retroactive adjustment for care provided in 1970 and 1971, and from current payments due to it, a total of $29,044.31, which DPW claimed represented overpayments to Skole in 1970, 1971

---

[1] The overpayments were as a result of the setting of final rates. The system for establishing interim and final rates of payment and retroactive adjustments is described in *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare*, 368 Mass. 15, 17-18 (1975). See G. L. c. 6A, § 32; G. L. c. 18, § 5E; 114 Code Mass. Regs. §§ 2.04 & 2.05 (1981).

[2] The stock ownership during those times was as follows:

| Kravetz | 126 shares | 42% |
|---|---|---|
| Toby K. Cohn | 111 shares | 37% |
| James F. Kentfield and Velma P. Kentfield | 63 shares | 21% |

[3] Since January 1, 1977, the stock ownership has been as follows:

| Kravetz | 155 ½ shares | 51.8% |
|---|---|---|
| Toby K. Cohn | 142 ½ shares | 47.5% |
| Stephen Jay Kravetz | 1 share | .3% |
| Sharon Ellen Kravetz | 1 share | .3% |

and 1974.[4] See 106 Code Mass. Regs. § 456.703(A) - (C) (1979). In so doing DPW relied on the regulation in question. In an internal memorandum, dated October 29, 1979, a copy of which was sent to Amherst, it was stated: "Ms. Kravetz is also the president, director and major shareholder (52.2% of shares issued)[5] of the Amherst Nursing Home, Inc. . . . Due to the common ownership of these facilities, the retro debt of Skole may be offset against present payments to Amherst, pursuant to the provisions of 106 CMR 456.703[E]." The contracts under which Amherst received payments from DPW provided that Amherst would comply with existing and future Federal and State regulations.

Amherst brought this action to recover the amount deducted by DPW. On cross motions for summary judgment (Mass.R.Civ.P. 56, 365 Mass. 824 [1974]), a Superior Court judge entered judgment for Amherst, and the Commonwealth appeals.

Amherst does not challenge the facial validity of the regulation (see G. L. c. 18, §§ 2[B][a] & 10; G. L. c. 118E, § 4; *Rock* v. *Massachusetts Commn. Against Discrimination,* 384 Mass. 198, 206-207 [1981], and cases cited), but only its application to the facts of this case. Amherst's argument is that Skole and Amherst are not now nor were they at the relevant times in "common ownership." The Commonwealth seems to argue that since Kravetz owned all of the stock of Skole and, *at the time of offsetting,* a majority of the stock of Amherst, the regulation was properly applied.

1. The interpretation of a regulation such as the one involved here is tested on review in the same manner as a statute and according to traditional rules of construction. See *Morin* v. *Commissioner of Pub. Welfare, ante* 20, 24 (1983), and cases cited. "Ordinarily an agency's interpretation of its own rule is entitled to great weight. However, this prin-

---

[4] The record is silent as to the discrepancy between the amount DPW claimed to be due and the amount withheld. There is no dispute as to the fact or amount of overpayments.

[5] For the correct percentage see note 3, *supra.*

ciple is one of deference, not abdication, and courts will not hesitate to overrule agency interpretations of rules when those interpretations are arbitrary, unreasonable or inconsistent with the plain terms of the rule itself." *Finkelstein* v. *Board of Registration in Optometry,* 370 Mass. 476, 478 (1976) (citations omitted). See *Cliff House Nursing Home, Inc.* v. *Rate Setting Commn., ante* 300, 306 (1983); *Board of Educ.* v. *School Comm. of Amesbury, ante* 508, 514 (1983).

2. The legislative policy, dictated by common sense and sound business practice, is to pay providers of nursing home care to those eligible for public assistance the reasonable costs of services. See 42 U.S.C. § 1395f[b][1][A] (Supp. 1981); G. L. c. 6A, § 32. The retroactive system of establishing rates (see note 1, *supra*) makes it inevitable that there will be adjustments in interim rates, and necessitates procedures reasonably calculated to cover those situations where it is determined that there has been an overpayment. Where, as here, a home is defunct, inability to look to contemporaneous common stock holdings (as hereinafter defined) of former stockholders of that home in other nursing homes also receiving public assistance would frustrate sound legislative policy. See *United States* v. *Pisani,* 646 F.2d 83, 88-89 (3d Cir. 1981); *United States* v. *Normandy House Nursing Home, Inc.,* 428 F. Supp. 421, 424-425 (D. Mass. 1977); *United States* v. *Thomas,* 515 F. Supp. 1351, 1356-1357 (W.D. Tex. 1981). Where a debt is owed to DPW by a nursing home on account of a final rate adjustment, an offset procedure provides an efficient means of recouping overpayments and of preserving "the integrity of the public purse." *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare,* 368 Mass. 15, 21, 25, 26 (1975). Moreover, Amherst signed contracts with DPW binding itself to comply with all Federal and State regulations then existing or promulgated during the course of the agreement. Thus Amherst was bound by the repayment provisions of 106 Code Mass. Regs. § 456.703(E), if that regulation was correctly applied to it.

DPW, however, is bound by the language of its regulation. It has chosen to extend liability only to providers who "are, or were, under a common ownership." We think the plain meaning of the terms "are" and "were," in context, necessarily implies a requirement that the common ownership be *contemporaneous* common ownership. Whether Kravetz's ownership interest in Amherst during the years overpayments were made to Skole was sufficient, with other factors, to bring both homes under common ownership is a question we are unable to answer on the limited record before us.

Where public funds are involved neither judicial nor regulatory definitions have required total identity of stockholders in order to find common ownership. Rather, whether common ownership exists has been defined pragmatically. We would be reluctant to adopt a definition of common ownership tied solely to quantum of ownership. Regulations promulgated to implement the Health Insurance for the Aged and Disabled Act (Medicare) (42 U.S.C. § 1395 et seq. [1976 & Supp. 1981]) define common ownership to exist "when an individual or individuals possess significant ownership or equity in the provider" as well as in the second institution in question. 42 C.F.R. § 405.427(b)(2) (1982). What is "significant" about ownership is the potential for control of the policy and course of the organization. See *Westland Housing Corp.* v. *Commissioner of Ins.*, 352 Mass. 374, 386 (1967). Direct or indirect ownership of a majority interest in a corporation often supports a finding of common ownership. See *W.R. Grace & Co.* v. *Commissioner of Rev.*, 378 Mass. 577, 586 n.9 (1979). Such an ownership interest, however, might not lead to a conclusion of common ownership where the majority shareholder does not possess the power to control the corporation. See *ASARCO* v. *Idaho State Tax Commn.*, 458 U.S. 307, 321-322 (1982). On the other hand, ownership of less than a majority interest may be sufficient for common ownership where control is centralized in that interest because the remaining interests are dispersed among numerous owners.

See *Marina Mercy Hosp.* v. *Harris,* 633 F.2d 1301, 1303 (9th Cir. 1980). A finding of common ownership is almost invariably linked with a concomitant finding of control. See, e.g., *N.L.R.B.* v. *Elias Bros. Big Boy, Inc.,* 325 F.2d 360, 362 (6th Cir. 1963); *NLRB* v. *Don Burgess Constr. Corp.,* 596 F.2d 378, 384-386 (9th Cir.), cert. denied, 444 U.S. 940 (1979); *Marina Mercy Hosp.* v. *Harris, supra*; *American Hosp. Management Corp.* v. *Harris,* 638 F.2d 1208, 1211 (9th Cir. 1981). Contrast *Brittingham* v. *Commissioner,* 598 F.2d 1375 (5th Cir. 1979) (Even though a family owned 37% of one corporation there was no common ownership for tax purposes between it and another corporation, in which two of the family members owned substantially all of the stock, without a showing of control.)

Essentially we are concerned with balancing the "substantial governmental purpose" of preserving "the integrity of the public purse" (*Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare,* 368 Mass. at 25) by recapturing money owed to the Commonwealth, with the fairness in attaching a penalty to Amherst in the form of reduced payments where ownership of Amherst and Skole was not identical. Were Kravetz a passive, albeit substantial, investor in Amherst during the time she was involved with Skole, we do not think her involvement would justify charging Amherst for overpayments to Skole. If, however, the facts indicate that Kravetz's stock ownership was coupled with control of Amherst's policy and operation, we think there would be a sufficient basis to support the application of the regulation providing for recoupment from Amherst of overpayments to Skole for the years in question. If such is the case, the equitable distribution of the resulting burden among the shareholders is a problem to be resolved by them.

3. There is nothing in the record from which we can assess Kravetz's role in Amherst during the years 1970, 1971 and 1974, in which DPW claims overpayments to Skole; nor is there any indication of her relationship, if any, to the other shareholders at those times, evidence of which could be critical to the resolution of the issue of control. Whether

common ownership existed is, therefore, an unresolved issue of material fact which makes summary judgment inappropriate. The judgment is vacated, and the case is remanded for proceedings in the Superior Court consistent with this opinion.

*So ordered.*