**In re WAYNE MANOR, INC. a/k/a Wayne Manor Nursing Home, Debtor.**

**WAYNE MANOR, INC., Plaintiff,**

v.

**DEPARTMENT OF PUBLIC WELFARE, FOR the COMMONWEALTH OF MASSACHUSETTS, Defendant.**

**Bankruptcy No. 88–10343–HL. Adv. No. 88–1163.**

United States Bankruptcy Court, D. Massachusetts.

July 15, 1988.

Harris G. Gorab, Boston, Mass., for plaintiff/debtor.

Leah W. Sprague, Sp. Asst. Atty. Gen., Commonwealth of Mass., Dept. of Public Welfare, Boston, Mass., for defendant.

## MEMORANDUM ON TURNOVER

HAROLD LAVIEN, Bankruptcy Judge.

The debtor, Wayne Manor, Inc., a nursing home, seeks to compel the Massachusetts Department of Public Welfare ("Department") to turn over $26,138.46. The Department withheld these funds from the monies it disbursed to the debtor prepetition to pay for the care of Medicaid recipients residing at the debtor's facility.

The strange history of this case started before 1981 when James D. Regan owned five nursing homes including Maregan Manor and Stadium Manor. On October 23, 1981, the debtor purchased the assets of Maragan Manor, Inc.

After the purchase of the assets of Maregan Manor, the Department, as was its custom in order to establish a permanent rate, audited interim payments made to Maregan Manor and Stadium Manor. The Department's policy is to make interim payments to nursing homes and then later perform an audit to determine if there were any discrepancies between what the nursing homes actually received and what it should have received. The Department, in the course of its audits, found that both Maregan Manor and Stadium Manor, respectively, owed $26,318.46 and over $400,-000 to the Department for Medicaid overpayments.

In 1982, after the purchase by an unrelated third party of Maregan Manor's assets and the change of its name to Wayne Manor, Inc., and after the discovery of the indebtedness, the debtor, although now under independent ownership, was required to sign an agreement stating it would assume liability for the indebtedness as a condition to receiving any further payments from the Department.

This agreement appears to have been successfully challenged in a state court proceeding; however, under the regulations of the Department of Public Welfare and the Court interpretations of the same nursing homes under joint ownership at the time of an overpayment might remain severally responsible. Mass.Regs.Code, title

106, § 456.703; *Amherst Nursing Home v. Commonwealth,* 16 Mass.App. 638, 454 N.E.2d 498 (1983) *aff'd after remand,* 398 Mass. 850, 501 N.E.2d 1161 (1987). In recognition that at least as to its predecessor, Maregan, there might be a rate adjustment for which it could be held responsible, the parties agreed as part of the sale of Maregan's assets to the debtor, that in the event the debtor was compelled to pay a Maregan rate adjustment, it would be reimbursed.

The Department did hold the debtor liable for the indebtedness of Maregan Manor. In the case of Stadium Manor, the Department, however, was looking towards Stadium Manor to pay off its own indebtedness. From December 1984 to June 1985, the Department deducted $26,318.36 from the debtor's Medicaid checks, expressly indicating on the claims remittance advice sent to Wayne that the deductions were for previous overpayments to Maregan Manor. The debtor does not seek turnover of these funds because Maregan Trust fully reimbursed the debtor pursuant to the purchase and sale agreement between the debtor and Maregan Trust. At this point, in 1985, the Maregan overpayment has been repaid in full.

The facts here take a disturbing turn from that of a Department acting properly to protect the public fisc to that of a heavy handed bureaucracy. During the period the debtor was paying off Maregan Manor's indebtedness, Stadium Manor filed for bankruptcy and eventually had a plan confirmed that would pay the claim of the Department ten cents of every dollar owed. The Department, without providing any notice to either Maregan Trust or the debtor, transferred the monies paid to extinguish Maregan Manor's indebtedness to Stadium Manor's account thereby with a simple unilateral internal bookkeeping entry, sought to reconstitute the original pre–1981 Maregan overpayment.

Commencing in June 1985, the Department began directly deducting from the debtor's Medicaid checks to offset Stadium Manor's indebtedness. In September 1985, the debtor obtained the entry of a preliminary injunction in the Suffolk Superior Court, Civil Action No. 78044, to enjoin the Commonwealth from making any further deductions from the debtor's Medicaid checks. The Department, had by this time again, withheld $26,138.36 from the debtor's Medicaid checks from June until September 1985, and it is these funds that that the debtor seeks to recover.

In 1986, the Department, in violation of the preliminary injunction, started to withhold funds from the debtor's Medicaid checks to set off Maregan Manor's reborn debt. The debtor went back to Superior Court and the Superior Court ordered the Department to return to the debtor the $15,563.94 in withheld payments as well as $438.47 in interest, and $750 in attorney's fees. At the same time, the Department now played the game in reverse and the second $26,138.36 apparently wrongfully withheld to offset Stadium Manor's indebtedness was transferred to pay the reborn Maregan Manor's account.

In arguments before this Court, counsel for the Department vehemently denied that the debtor had previously paid the Maregan Manor account twice and insisted that the first $26,318.36 had been returned. However, when, in testifying or cross-examination, the Department director of Retroactive Rate Recovery Unit produced the check showing the alleged return of the first full withholding from the debtor in payment of the Maregan Manor account. The payee was not the debtor, but Stadium Manor. If there was any confusion, it was generated by the Department's slight of hand bookkeeping. It was now clear that the indebtedness of Maregan Manor had been collected twice. Under the wonders of bureaucratic logic, however, their unilateral transfer of the funds from payment in full of the Maregan account to the account of Stadium resulted in a phoenix-like rebirth of the total Maregan overpayment. Considering the Department's contention that this independent debtor was responsible in any event for any deficiency resulting from Stadium's confirmed Chapter 11 plan, why then the convoluted bookkeeping? Can it be that the bureaucracy, when given a choice, prefers an indirect, complex, and devious approach to its prob-

lems? Or, is this really a simple attempt to extract payment by reaching a deeper pocket, regardless of the method that has to be used?

The Department offered two defenses and filed a motion to dismiss. The basis of the first defense and the motion to dismiss is that the Eleventh Amendment deprives the Bankruptcy Court, as a federal court of jurisdiction.[1] The Department's other defense is that the debtor failed to state a cause of action. The First Circuit has recently considered both defenses in a very similar dispute between two nursing homes and the Department. *WJM, Inc. v. Massachusetts Department of Public Welfare,* 840 F.2d 996 (1st Cir.1988).

The Court first considered the motion to dismiss which it denied. The motion to dismiss and the first defense rests on the Eleventh Amendment which states:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

The Court in *WJM,* after extensive discussion, found that the Department waived its right to invoke the Eleventh Amendment by filing a proof of claim in the bankruptcy court. 840 F.2d, at 1003–08; 11 U.S.C. § 106(a). However, that analysis would not apply here since the Department has not filed and has represented; to the Court that it will not file a proof of claim in this bankruptcy, thereby making *WJM* not controlling on this question of law.

This forces the Court to re-examine the issue that the First Circuit declined to reach, namely, whether Congress can abrogate the Eleventh Amendment through legislation. The First Circuit in *WJM,* while not deciding the issue, discussed the two legal tests to determine whether the Eleventh Amendment has been abrogated; (1) whether Congress has the inherent power to abrogate the Eleventh Amendment; and

(2) whether Congress has abrogated the Eleventh Amendment to allow the debtor to bring an action of turnover under 11 U.S.C. § 542, 28 U.S.C. § 157(b)(2)(E), *WJM* 840 F.2d, at 1001–02.

■ The First Circuit, through Chief Judge Campbell, declined to reach the issue of abrogation because of "... the uncertainty that permeates the subject of abrogation." *WJM,* 840 F.2d, at 1002. Judge Campbell explains that the uncertainty stems from the Supreme Court's recent decisions where it has expressly declined to determine whether Congress can abrogate the Eleventh Amendment under any provision of the Constitution except for the Fourteenth Amendment which expressly provides, in Section 5, that citizens can sue states under the Fourteenth Amendment. *WJM,* 840 F.2d, at 1002, fn. 6. In light of these recent decisions, the First Circuit was not sure that an older Supreme Court decision that ruled that Congress can abrogate the Eleventh Amendment under the Commerce Clause which is in the same part of the Constitution as the Bankruptcy Clause, Article I, cl. 8 was still good law. *Parden v. Terminal Railways,* 377 U.S. 184, 190–193, 84 S.Ct. 1207, 1211–13, 12 L.Ed.2d 233 (1964). Nor did the First Circuit give much weight to Circuit Court Opinions that found Congress can abrogate the Eleventh Amendment under various sections of the Constitution prior to the Supreme Court ruling in *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 246, 105 S.Ct. 3142, 3149–50, 87 L.Ed.2d 171 (1985) that Congress' intent to abrogate the Eleventh Amendment must be expressed in clear unequivocal language. *WJM,* 840 F.2d at 1002, fn. 7, *citing, County of Monroe v. Florida,* 678 F.2d 1124 (2d Cir.1982) *cert. denied,* 459 U.S. 1104, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983); *Peel v. Florida,* 600 F.2d 1070 (5th Cir.1979); *Mills Music v. Arizona,* 591 F.2d 1278 (9th Cir.1979). Finally, Judge Campbell, in footnote 7, did not find *In re McVey,* 812 F.2d 311 (7th Cir.1987) ruling that Congress has the pow-

---

1. The Supreme Court held the Eleventh Amendment also encompasses a suit by a citizen against his own state in federal court. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). This Court is following the First Circuit in considering sovereign immunity and Eleventh Amendment to be the same. *WJM,* 840 F.2d, at 1001, fn. 5.

er pursuant to the Bankruptcy Clause of the Constitution, Article I, § 8, to abrogate the Eleventh Amendment, standing alone able to dissipate the uncertainty.

The First Circuit, since the Department filed a proof of claim, did not have to resolve the issue and did not consider the other federal courts that decided the question of abrogation in light of *McVey*, including the Third Circuit, which follows *McVey, United States v. Union Gas Company*, 832 F.2d 1343 (3rd Cir.1987); *Charter Oak Federal Savings Bank v. State of Ohio*, 666 F.Supp. 1040 (S.D.Ohio 1987); *BV Engineering v. Univ. of Cal. Los Angeles*, 657 F.Supp. 1246 (C.D.Cal.1987); *Tew v. Arizona State Retirement System*, 78 B.R. 328 (D.S.Fla.1987); *In re Watts*, 76 B.R. 390 (Bankr.E.D.Pa.1987). Both *McVey* and *Union Gas* extensively explore history and theory behind the Eleventh Amendment and find that Congress has the authority to subject unconsenting states to federal jurisdiction under any section of the Constitution, *McVey*, 812 F.2d at 319–23; *Union Gas*, 832 F.2d, at 1350–56. They persuasively argue that the Supreme Court, in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), by finding that the Constitution "divested [the states] of their original powers and transferred those powers to the Federal Government", 469 U.S. at 549, 105 S.Ct. at 1016, and also, by finding "the Constitution does not carve out express elements of state sovereignty that Congress may not employ its delegating powers to displace." *Id.*, at 550, 105 S.Ct. at 1017, has, defacto, found that Congress can abrogate the Eleventh Amendment. *McVey*, 812 F.2d, at 320; *Union Gas*, 832 F.2d, at 1352. Both Circuits also dismiss the contention that the Eleventh Amendment was meant to absolutely grant states sovereign immunity from sections of the Constitution that preceded the Eleventh Amendment in time by finding the Constitution is to be read as one integral unit. *McVey*, 812 F.2d, at 317–18. *Union Gas*, 832 F.2d, at 1351–52. Finally, *McVey* explains why Congress must have the power to abrogate the Eleventh Amendment if Bankruptcy Courts are to remain viable.

If the federal courts were not able to order a state to turn over assets to a bankruptcy estate, then any state owed money by a debtor having financial problems would have a strong incentive to collect whatever funds it believed to be due as rapidly as possible—even if this pushed the debtor into insolvency—rather than risking the possibility of recovering only a portion of their debt in any subsequent bankruptcy proceedings. In effect, we would be holding that the Constitution makes a state a preferred creditor in every bankruptcy. The very existence of this power would doubtless encourage other creditors to accelerate their collections. The end result would be an increase in bankruptcies and a distortion of the system of preferences that Congress has carefully crafted. We seriously doubt that either the Eleventh Amendment or the doctrine of sovereign immunity demands such a fundamental disruption of the bankruptcy system.

*McVey*, at 328.

The First Circuit discussion on the issue of abrogation largely being dicta and, in any event, having left the issue open, this Court has found the rationale of the Third and Fifth Circuits persuasive in determining that Congress, at least, has the power to subject the states to its bankrupt jurisdiction, provided it clearly indicates its intention to do so.

■ This Court, having found Congress has the authority to subject unconsenting states to federal jurisdiction, must now determine whether Congress expressed "... its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Atascadero State Hospital v. Scanlon*, 473 U.S., at 243, 105 S.Ct. at 3147. The First Circuit in *WJM* stated that many sections of the Bankruptcy Code, "... When read with two other Code sections, 11 U.S.C. § 101(26), § 106(c) (Supp. IV 1986) plainly set forth a cause of

action against a state." 840 F.2d, at 1001.[2] Section 106(c) provides that "a provision of [the Bankruptcy Code that contains ... entity ... applies to governmental units; and (2) a determination by the court of an issue arising under such a provision binds governmental units". Section 101(26) defines governmental unit to include state government. The debtor, pursuant to Section 542 of the Bankruptcy Code can compel an "entity", including state government, to turnover property belonging to the estate before the filing of the bankruptcy petition. It should be noted that what is being sought is a return of defined property of the estate and not a tort type of damage recovery that might entail taxation and the legislative appropriation of funds. *Tew v. Arizona State Retirement System,* 78 B.R. 328 (D.S.Fla.1987). *See also, In re Shelby County Health Care Services of AL, Inc.,* 80 B.R. 555 (Bankr.N.D.Ga.1987); *In re Lawson,* 59 B.R. 681 (Bankr.S.D.N.Y. 1986). Therefore, this Court rules that it has the jurisdiction over the states to deal with turnover as a core provision under 28 U.S.C. § 157(b)(2)(E) and that Congress has made it clear that for these purposes, the states are subject to the Bankruptcy Act.

■ The Court, having found the state can be required to turnover, must consider the Department's one sentence assertion that the debtor failed to state a cause of action. The Department's bald statement has no basis in law or in fact.

This Court recognizes that unlike *WJM, supra,* the proceeding before us does not concern a preference. The Department, because it obtained the property of the debtor more than 120 days, pre-petition, may not be responsible for a voidable preference in its transfer of funds to Stadium, however, it can, nonetheless, be held liable for any improper disbursements of the debtor's property to Stadium. 11 U.S.C. § 543(c)(3).

What the Department in fact did, was collect twice from the debtor on account of its predecessor's overpayment and then, recognizing the problem, sought to rectify it by claiming it returned the first $26,-138.36 to the debtor when, in fact, it issued a check, not to the debtor, but to Stadium, and simply, without notice or authorization, transferred the funds on its books[3] this second time for an account already fully paid. The Department failed to show that any proper disbursements were made and, therefore, is liable for the full amount of the debtor's property wrongfully withheld.

The Court, therefore, finds that the Department wrongfully holds $26,138.36 of the debtor's property which it alleged it returned, but did not, and is now ordered to do so by turning over, forthwith, to the debtor the said $26,138.36.

---

**2.** *See also, In re McVey,* 812 F.2d 311 (7th Cir. 1987); *In re Vazquez Guerrero and Compton,* 788 F.2d 130 (3rd Cir.1986), 124 Cong.Rec.H. 11091 (daily ed. Sept. 28, 1978); 124 Cong. Rec.S. 17407 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen. DeConcini.

**3.** Consistent with the Department's conduct, Norman M. Flara sought to obfuscate how much money the Department withheld from the debtor by not freely and fully responding to questions. The Court hopes that the Department, in the future, will act more in a manner that reflects positively on the high calling of government service.