SAMUEL HELLMAN vs. BOARD OF REGISTRATION IN MEDICINE.

Suffolk. March 8, 1989. — May 3, 1989.

Present: WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Doctor*, Privileged communication. *Privileged Communication. Privacy.*
*Words*, "Gross misconduct."

A determination by the Board of Registration in Medicine that a physician's
action in discussing his treatment of a patient with a defense attorney
the day before a deposition in the patient's pending medical malpractice
action, to which the physician was not a party, was "gross misconduct"
in the practice of medicine was not supported by substantial evidence,
where the physician's violation of the duty of confidentiality to his
patient, resulting from his "erroneous" belief that confidentiality had
been waived in the circumstances, did not amount to "flagrant" or wilful
misconduct. [803-806]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on July 29, 1987.

The case was heard by *Lynch, J.*

*Jane S. Schacter*, Assistant Attorney General, for the defendant.

*Wilson D. Rogers, Jr.*, for the plaintiff.

ABRAMS, J. The Board of Registration in Medicine (board)
appeals from a determination by a single justice of this court
that the board's decision to discipline Dr. Samuel Hellman for
"gross misconduct" in the practice of medicine was not sup-
ported by substantial evidence. See G. L. c. 30A, § 14. The
board imposed sanctions on Dr. Hellman for a conversation
he had with an attorney concerning the care and treatment of
L.E. (patient). See G. L. c. 112, § 5 (c), as appearing in St.
1981, c. 639, and 243 Code Mass. Regs. § 1.03 (5) (a) (3),
as appearing in 1980.[1] For the reasons stated in this opinion,
we affirm the decision of the single justice.

_____

[1] General Laws c. 112, § 5, as appearing in St. 1981, c. 639, provided
in pertinent part: "The board may, after a hearing pursuant to chapter thirty A,

Dr. Hellman treated the patient for paraganglioma from February or March, 1981, through early summer, 1982. Dr. Hellman was then chief of radiation therapy at Brigham and Women's Hospital and director of the Harvard Joint Center for Radiation Therapy. Prior to consulting with Dr. Hellman, the patient had been under the care of several other physicians. In June, 1982, the patient sued these other physicians and their associated institutions (the malpractice defendants) for malpractice, alleging that they had failed to diagnose and treat her condition. Dr. Hellman was not a party to that action. Two of the malpractice defendants retained Attorney Raymond J. Kenney, Jr., to represent them.

In June, 1983, Mr. Kenney learned that Dr. Hellman was leaving Massachusetts to accept a position as chair of clinical oncology at Memorial Sloan-Kettering Cancer Center in New York. In order to preserve Dr. Hellman's testimony for the malpractice action, Mr. Kenney served Dr. Hellman with a subpoena requiring him to appear at a deposition on June 24, 1983, and to produce all his records and office notes pertaining to the patient. The patient and her attorneys were notified of the deposition.

---

revoke, suspend, or cancel the certificate of registration, or reprimand, censure, or otherwise discipline a physician registered under said sections upon proof satisfactory to a majority of the board that said physician: . . . (c) is guilty of gross misconduct in the practice of medicine or of practicing medicine fraudulently, or beyond its authorized scope, or with gross incompetence, or with gross negligence on a particular occasion or negligence on repeated occasions . . . ."

Title 243 Code Mass. Regs. § 1.03 (5) (a), as appearing in 1980, provided in pertinent part: "(5) *Grounds for Complaint.* a. *Complaints Against Physicians.* A complaint against a physician must allege that a registrant is practicing medicine in violation of law, regulations, or good and accepted medical practice and may be founded on any of the following: . . . (3) gross misconduct in the practice of medicine, or practicing medicine fraudulently, or beyond its authorized scope, or with gross incompetence, or with gross negligence on a particular occasion or negligence on repeated occasions . . . ."

Both these provisions have subsequently been amended with the addition of the words "conduct which places into question the physician's competence to practice medicine, including but not limited to" before "gross misconduct." The earlier versions apply to the present case. See note 5, *infra*.

On June 23, 1983, Mr. Kenney came to Dr. Hellman's office to discuss the deposition scheduled for the following day. Dr. Hellman asked Mr. Kenney if it was appropriate for them to speak with each other. Mr. Kenney replied that it was. In the course of their half-hour conversation, Mr. Kenney described the procedure of the deposition and told Dr. Hellman what questions, generally, he expected to pose. Mr. Kenney asked Dr. Hellman the general substance of his testimony for the following day, and Dr. Hellman told him, discussing in general his treatment of the patient and her condition. Mr. Kenney also asked to see Dr. Hellman's records on the patient and thumbed through them. Mr. Kenney told Dr. Hellman that he already had the same records through the Brigham and Women's Hospital department of radiation therapy, where Dr. Hellman had treated the patient, but Dr. Hellman did not verify that, in fact, Mr. Kenney already had seen the same records. Dr. Hellman did not tell his patient of this meeting in advance or ask her permission to speak with Mr. Kenney.

Dr. Hellman was deposed on the following day. Several days later the patient wrote to the board complaining of Dr. Hellman's breach of confidentiality in speaking with Mr. Kenney before the deposition. She wrote: "I feel that it was highly improper for Dr. Hellman to have spoken with anyone about my medical condition and treatment without my permission or knowledge, and I am quite concerned with insuring that this situation does not repeat itself with other physicians or other patients. This flagrant breach of trust does nothing to restore my confidence in a profession which has already caused me a great deal of pain and anguish in recent years."

In addition to the foregoing, the board found as follows: "Dr. Hellman understood his responsibility to keep patient records confidential unless they were being discussed with a colleague involved in the case or the patient had given permission for disclosure. Dr. Hellman said that when he spoke to Mr. Kenney on June 23, he did not have a release to do so from [the patient], that it was not his normal procedure to talk to people about his patients without a release, and that he presumed that, according to the [b]oard, it was not what one

should do. . . . Dr. Hellman believed his discussion with Mr. Kenney was appropriate because Mr. Kenney had said he already had [the patient's] complete records, of which the Brigham radiotherapy records were a part, because he [Dr. Hellman] believed the subpoena was a waiver of confidentiality by [the patient], and because her situation was . . . a matter of public record by her having brought her lawsuit." The board characterized Dr. Hellman's beliefs about waiver of confidentiality in the context of the imminent deposition and the pending malpractice action as "erroneous." The board concluded that Dr. Hellman's disclosures, whether or not they revealed anything previously unknown to Mr. Kenney, "constituted gross misconduct in the practice of medicine and an absence of good and accepted medical practice in violation of [G. L. c.] 112, [§ ] 5(c), and 243 [Code Mass. Regs. § ] 1.03(5)(a)(11), and in violation of [G. L. c.] 112, [§ ] 5 (h), and 243 [Code Mass. Regs. § ] 1.03(5)(a)(11), by virtue of the violation of 243 [Code Mass. Regs. § ] 1.03(5)(a)(3)."

The board determined that Dr. Hellman owed the patient a duty of confidentiality and that he violated that duty. The question before us is whether Dr. Hellman's breach of duty, based on beliefs that the board characterized as erroneous, may be said to constitute "gross misconduct." The board argues forcefully that confidentiality is a cardinal rule of the medical profession and that there is no excuse for Dr. Hellman's failure to telephone his patient to ask her permission to speak with Mr. Kenney. The board contends that all the other circumstances may be (and were) considered in mitigation of the sanction imposed. The board emphasizes its broad powers to define misconduct and to impose sanctions.

We interpret a regulation "in the same manner as a statute[,] and according to traditional rules of construction." *Amherst Nursing Home, Inc.* v. *Commonwealth*, 16 Mass. App. Ct. 638, 640 (1983). See *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 854-858 (1977). "It is a well established principle of statutory interpretation that '[n]one of the words of a statute is to be regarded as superfluous, but each is to be given its ordinary meaning . . . ." *Commonwealth*

v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 352 Mass. 617, 618 (1967). See *Hashimi* v. *Kalil*, 388 Mass. 607, 609 (1983). "Ordinarily an agency's interpretation of its own rule [or regulation] is entitled to great weight. . . . However, this principle is one of deference, not abdication, and courts will not hesitate to overrule agency interpretations . . . when those interpretations are arbitrary, unreasonable or inconsistent with the plain terms of the rule [or regulation] itself." (Citations omitted.) *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976).

We turn to the meaning of the words "gross misconduct." "'Misconduct', in general, is improper conduct or wrong behavior, but as used in speech and in law it implies that the conduct complained of was willed and intentional. It is more than that conduct which comes about by reason of error of judgment or lack of diligence. It involves intentional wrongdoing or lack of concern for one's conduct. Whether or not an act constitutes misconduct must be determined from the facts surrounding the act, the nature of the act, and the intention of the actor. 'Gross' is generally defined as 'flagrant' and 'extreme.'" *State ex rel. Gremillion* v. *O'Hara*, 252 La. 540, 552 (1968). Webster's New International Dictionary 1106 (2d ed. 1959), defines "gross" in part to mean "[o]ut of all measure; beyond allowance; not to be excused; flagrant; shameful; as, a *gross* injustice." In the context of negligence, we have stated: "Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. . . . It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others." *Altman* v. *Aronson*, 231 Mass. 588, 591 (1919). See *Boston & Me. R.R.* v. *Aetna Casualty & Sur. Co.*, 329 F.2d 602, 605 (1st Cir. 1964).

The board based its decision to impose sanctions on case law in Massachusetts and elsewhere. The two major cases on

which the board relies to support its conclusion that the conduct of Dr. Hellman was "gross misconduct" were decided after Dr. Hellman's meeting with Mr. Kenney. See *Alberts* v. *Devine*, 395 Mass. 59, cert. denied sub nom. *Carroll* v. *Alberts*, 474 U.S. 1013 (1985); *Tower* v. *Hirschhorn*, 397 Mass. 581 (1986). See also *Schwartz* v. *Goldstein*, 400 Mass. 152 (1987).[2] Cases in other jurisdictions were divided on the issue of waiver prior to trial.[3] The sources of professional ethics do not address the specific circumstances of this case.[4] The facts found by the board could be said to support a conclusion that Dr. Hellman's conduct was erroneous or even, perhaps, that it

---

[2] Several months before Dr. Hellman's meeting with Mr. Kenney, we decided *Ryan* v. *Board of Registration in Medicine*, 388 Mass. 1013 (1983). In *Ryan*, the doctor released information about his patient to the press in order to defend himself against the patient's allegations of misconduct. In contrast to the present case, neither the patient's allegations nor the doctor's disclosures came in the course of litigation. We held that because there had been no disclosure of information before the physician made it public, there was no *possibility* of demonstrating waiver. We therefore affirmed the board's decision. Thus, in 1983, *Ryan* could be read to hold that when confidential information has already been disclosed in the course of litigation, the right of confidentiality is waived.

[3] Cases such as *Horne* v. *Patton*, 291 Ala. 701 (1973); *Hammonds* v. *Aetna Casualty & Surety Co.*, 243 F. Supp. 793 (N.D. Ohio 1965); and *Alexander* v. *Knight*, 197 Pa. Super. 79 (1962) (see 25 Pa. D. & C. 2d 649 [1961] for text of opinion), support the board's conclusion that the physician always needs the patient's permission to speak with a third person prior to trial. Other decisions hold precisely the opposite: that in the context of litigation, public policy favors informal disclosure of otherwise confidential information. See *Orr* v. *Sievert*, 292 S.E.2d 548 (Ga. App. 1982); *Trans-World Invs.* v. *Drobny*, 554 P.2d 1148 (Alaska 1976); *Hague* v. *Williams*, 37 N.J. 328 (1962).

[4] See American Medical Association Principles of Medical Ethics, Code of Professional Responsibility 101 (Gorlin ed. 1986). See also the Hippocratic Oath, which states in part: "Whatever, in connection with my professional practice, or not in connection with it, I see or hear, in the life of men, which ought not to be spoken of abroad, I will not divulge, as reckoning that all such should be kept secret" (quoted in *Hague* v. *Williams*, 37 N.J. 328, 332 [1962]).
The AMA principles and the Hippocratic Oath make it clear that, in medical ethics, confidentiality is the rule and disclosure is the exception. The principles explicitly permit testimony in court, without qualification as to the patient's consent, and subject the rule of confidentiality to "the constraints of the law."

constituted misconduct.[5] The cases and canons of professional ethics do not support a conclusion that Dr. Hellman's conduct was "flagrant," or wilful, or that it showed utter indifference to present legal duty.

We view the present case narrowly. It does not involve a physician idly gossiping about his patient. It does not involve fraud or dishonesty.[6] The issue is whether a physician who, on the day before a scheduled deposition in a pending medical malpractice case, spoke with the attorney who was going to depose him, has acted in flagrant disregard of the patient's right of confidentiality. Dr. Hellman should have been more cautious and telephoned his patient for permission to speak with Mr. Kenney. However, Dr. Hellman's actions, based on his erroneous belief, were not flagrant or extreme misconduct. Thus, there was no substantial evidence to support the board's conclusion of "gross misconduct."

For these reasons, the decision of the single justice reversing the board's conclusion of "gross misconduct" is affirmed.

*So ordered.*

---

[5] We do not reach or decide whether the erroneous judgment of Dr. Hellman constitutes "misconduct" but not gross misconduct because the regulations in effect in 1983 required "gross misconduct" for the imposition of sanctions. Subsequently, a new subsection (18) has been added to 243 Code Mass. Regs. § 1.03 (5) (a). The new subsection permits discipline for misconduct which is not gross.

[6] Massachusetts cases in which physicians were found guilty of gross misconduct bear little resemblance to this case. See *Forziati* v. *Board of Registration in Medicine*, 333 Mass. 125 (1955); *Dugdale* v. *Board of Registration in Medicine*, 270 Mass: 65 (1930). These cases involved dishonesty and fraud. Such conduct is not involved in this case. See also *Raymond* v. *Board of Registration in Medicine*, 387 Mass. 708, 712 (1982) (conviction for possession and sale of unregistered guns sufficiently "calls into question [physician's] ability to practice medicine" to be basis for discipline); *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299 (1981); *Levy* v. *Board of Registration and Discipline in Medicine*, 378 Mass. 519, 524 (1979) (nursing home operator's fraud against the Department of Public Welfare sufficiently "related to the practice of medicine" to form basis for discipline where acts are "unprofessional or dishonorable").